HARRY W. MACLARY, ALFRED S. MACLARY and ELLA MAE MACLARY,

*vs.*

PLEASANT HILLS, INC., a corporation of the State of Delaware, ROBERT P. MACLARY, BESSIE M. DONOVAN, EMMA S. MACLARY, REBECCA M. TURNER, EDITH C. MACLARY and CLARENCE P. DONOVAN.

*New Castle, December 6, 1954.*

*William Poole,* of Berl, Potter & Anderson and *Abraham Hoff-man,* Wilmington, for plaintiffs.

*Albert W. James,* and *Henry van der Goes,* of Morris, James, Hitchens & Williams, Wilmington, for individual defendants.

*Edward W. Cooch, Jr.,* Wilmington, for defendant corporation, Pleasant Hills, Inc.

SEITZ, Chancellor: This is the decision after final hearing in a stockholders' derivative action seeking:

1. Cancellation of certain stock;

2. The recovery of an alleged illegal loan from the corporation to a director;

3. The recovery of certain real estate obtained by some of the individual defendants from the corporation for an inadequate consideration, or in lieu thereof repayment of the difference in value. Plaintiffs also seek to recover profits made by one of the individual defendants on the sale of certain houses on the basis of the corporate opportunity doctrine.

In order to point up sharply the issues for decision, it is necessary to commence with the organization of the corporate defendant, Pleasant Hills, Inc. (hereafter called "Pleasant Hills" or the "corporation"). It was incorporated on May 25, 1940, and was the brain child of one of the individual defendants, Robert P. Maclary (hereafter called "Robert"), who throughout the period involved was the dominant figure in the matters now under scrutiny.

Shortly after incorporation, the parents of Robert transferred a tract of about 111 acres to the corporation for the purpose of creating a real estate development. The development known as Pleasant Hills was created by the erection of numerous homes, most of which were later rented by the corporation. Indeed, it now has a profitable business along that line. In consideration of the transfer of the land, the corporation on May 28, 1940 authorized the issuance of 300 shares of its capital stock (there being only one class) to Robert's parents. At this same meeting a resolution was also passed authorizing the issuance of 100 shares of stock to the individual defendants, Robert and his sisters, Emma S. Maclary, Bessie M. Donovan and Rebecca M. Turner. According to the language of the resolution, it was issued to them for approximately $10,000 in expenditures made by them for the benefit of the corporation. They constituted the board of directors at that time. This is the first transaction under attack.

Defendants first contend that plaintiffs may not attack the issuance of the 100 shares authorized by the resolution of May 28, 1940 because of 8 *Del.C.* § 327, which provides:

"In any derivative suit instituted by a stockholder of a corporation organized under the laws of this State, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

*Chancery Court Rule* 23(*b*), *Del.C.Ann.*, contains a similar provision.

This is, of course, a derivative action but the parties are in disagreement as to whether the facts call for the application of the statute. In order to resolve this dispute, it is necessary to narrate certain undisputed facts. The resolution authorizing the issuance of the 100 shares was passed on May 28, 1940, but no certificates were executed and delivered at that time. On December 23, 1941, the defendants' mother—the plaintiffs' grandmother—died and by virtue of the Anti-Lapse Statute, 12 *Del.C.* § 2313, plaintiffs became equitably entitled to a portion of her stock. However, prior thereto, no certificates had then been issued either for the original 300 shares or the additional 100 shares now in issue. It was not until May 18, 1943, that certificates were issued which included the 100 shares now under attack. And even then no certificates were issued to plaintiffs although they were entitled to them even prior thereto. In fact, plaintiffs did not receive their certificates until several years later although there was an explanation, if not a justification, therefor.

Plaintiffs say that the "transaction complained of" was not complete at least until the certificates representing the 100 shares were put into circulation on May 18, 1943. By this time plaintiffs were certainly equitable shareholders. It is not always easy to define the "transaction" contemplated by the statute and to decide when it has been completed for purposes of applying the statute. This case demonstrates some of those difficulties. And so, while the statute should be construed so as to reasonably effectuate its primary purpose

—to discourage a type of strike suit—it should not be construed so as to unduly encourage the camouflaging of transactions and thus prevent reasonable opportunities to rectify corporate aberrations. While the court is not suggesting that the delay in issuing the certificates here was based on any such reason, it is the fact that the responsibility for the delay here in issuing the certificates must fall entirely upon the principal individual defendants.

The issue, as I see it, is this: when shares are authorized to be issued, for purposes of applying the statute, is the "transaction" complete when a resolution of authorization is passed or when the certificates are issued? In resolving this issue it is important to consider the statute. It prevents a stockholder from attacking transactions completed before he becomes a stockholder. This statute was not passed to prevent the correction of corporate wrongdoing. It was designed principally to prevent the purchasing of stock to be used for the purpose of filing a derivative action attacking transactions occurring prior to such purchase. See *Rosenthal v. Burry Biscuit Corp.,* 30 *Del.Ch.* 299, 60 *A.2d* 106. Thus, there is nothing in the policy behind the statute which would call for a construction favoring its application in situations where inexcusable inaction on the part of corporate personnel might make it less likely that wrongdoing would be discovered. It would seem more likely that a wrongful issuance of stock would be discovered if the issuance thereof and the stockholders appeared of record. To consider this transaction as having been completed prior to the issuance of the certificates would sanction an application of the statute not required by its language and not fairly required to effectuate its purpose. On the contrary, it would place a premium on corporate conduct which might run counter to desirable standards.

*Elster v. American Airlines,* 34 *Del.Ch.* 94, 100 *A.2d* 219, relied upon by defendants, is inapplicable. There the attack was upon the issuance of certain stock options. Certain stockholders contended that, for the purpose of applying the present statute, the "transaction" was not complete until the stock was issued. As the opinion shows, the transaction attacked was the issuance of the options—not the subsequent issuance of stock pursuant to an exercise of the option.

Thus the "transaction" complained of was completed before those plaintiffs became stockholders.

I conclude that where the issuance of stock is authorized and where certificates are presumably to be issued therefor at once, and that is the very action under attack, the transaction is not complete for purposes of applying 8 *Del.C.* § 327 until the certificates are issued. I think it misleading to attempt to apply to this situation the conclusions reached in situations involving different legal and factual relationships. In view of my conclusion, it becomes unnecessary to decide whether plaintiffs' shares devolved upon them by operation of law under the statutory exception contained in 8 *Del.C.* § 327—assuming that issue is properly before the court. Plaintiffs are therefore entitled to attack the 100 share transaction.

Now to the merits of plaintiffs' attack. They contend that the 100 shares were issued without consideration and should be cancelled. Defendants assert that $6,300 of the $10,000 was paid in cash to the corporation by the individual defendants. The defendants argue that this consideration, together with valuable services rendered by them to the corporation, was sufficient consideration for the issuance of stock.

First off, it is undisputed that, contrary to the language of the resolution, the individuals did not expend any significant sum of money for the benefit of the corporation prior to the passage of the resolution. The resolution is therefore not factual in this respect and defendants frankly so concede.

But defendants seek to justify the issuance of the 100 shares on the basis of a contention that the corporation received $10,000 in cash and services after the resolution was passed. First they say the corporation received $6,300 from bank loans. Let us consider this point. The facts show that in November and December 1942, Robert, Bessie and Clarence Donovan borrowed a total of $6,300 from a bank upon two judgment notes executed by them individually. The amount thus borrowed less discount was deposited in the corporate account. These notes were paid by Robert. And the corporate records did not show the sum as an account payable. One page of the corporate

ledger dated June 19, 1943 bears a notation "Maclary investment * * * miscellaneous items—$6,239.34". Defendants say it is reasonable to believe that this represents the $6,300 loan, less discount and after possible adjustments.

Plaintiffs point out that there is nothing in the corporate records which even remotely suggests that this was ever treated as money paid into the corporation by the individuals in partial payment for the purchase of stock. In all the book entries dealing with the corporate stock, nowhere is there an item which suggests that the $6,300 was ever treated as payment for stock. And of vital importance, the corporation paid the interest on the loan.

All that can be said about the present contention of the individual defendants is that it is an afterthought now being used to attempt to transform the facts as they appeared at the time of the transaction.[1] This endeavor by the defendants is similar to the unsuccessful attempt made to justify the issuance of shares of stock in the case of *Blair v. F. H. Smith Co.*, 18 *Del.Ch.* 150, 156 *A.* 207. I find that the $6,300 were loans to the corporation. The interest payments thereon by the corporation tend to so indicate. The fact that some of the individual defendants signed the notes and that Robert repaid them does not alter the result under the evidence in this case. Of course, the corporation will be required to acknowledge the $6,300 obligation to Robert, and the parties will be heard on the question of interest, if any, thereon.

Defendants attempt to justify the difference between the $6,300 and the total $10,000 allegedly paid for the stock on the basis of valuable services rendered by them for the benefit of the corporation, also after the resolution was passed. Passing over plaintiffs' objection that Robert did no more than a director is supposed to do, the fact remains that there was no evaluation of any such alleged services by the board of directors. Obviously the resolution of the board did not evidence an evaluation because the resolution purportedly justified the issuance of the 100 shares solely on the basis of

1. Indeed, Robert Maclary took the position in 1946 that each of the four identified individual defendants had been given 25 shares of stock "for the development of the company".

money already disbursed for the benefit of the corporation by the individual defendants. And the resolution was passed before the services relied upon were rendered. Since the directors did not evaluate the services relied upon in partial justification for the issuance of the 100 shares, such services cannot be used to justify the issuance of any part of the 100 shares. See *Bowen v. Imperial Theatres, Inc.,* 13 *Del.Ch.* 120, 115 *A.* 918.

Another defect in defendants' argument concerning the use of services rendered arises from the fact that directors cannot evaluate their own services and determine the amount of stock to be issued therefor. See *Cahall v. Lofland,* 12 *Del.Ch.* 299, 114 *A.* 224, affirmed 13 *Del.Ch.* 384, 118 *A.* 1. Since the recipients of the stock here were admittedly the directors at the time, it follows as a matter of law, there being no other justification advanced, that the issuance of the 100 shares of stock cannot be supported in any part on the basis of such alleged services.

Nor can it be successfully contended that, contrary to the language of the resolution, the directors meant to authorize the issuance of the stock for future services. This is so because the statute does not authorize the issuance of full-paid stock for future services. See *Scully v. Automobile Finance Co.,* 12 *Del.Ch.* 174, 109 *A.* 49.

Defendants point out that in the developmental stage Robert performed many gratuitous services for the corporation and also lent it substantial sums of money interest free. I have no doubt that he rendered yeoman service and is to be credited with making a dream come true. This case points up graphically the difficulties which may arise from the use of the corporate form, particularly in small, closely held businesses, without seeing that the legal requirements of that form are followed. Failure to do so often leads, as here, to admitted inequities. While this court is sympathetic to Robert's position, it is not free to ignore the law merely because of the hard facts of a particular case.

The substantial equities existing in favor of the individual defendants do permit the court to grant them an election to decide whether they desire to retain such shares upon the condition that they

pay the original price plus interest, rather than have them cancelled. Since there was no legal impediment to the issuance of the shares at the authorization date and in view of the several years of uncompensated efforts by defendants—particularly Robert—on behalf of the corporation. I believe a court of equity is entitled to grant such an election. See *Blair v. F. H. Smith Co.,* above.

But defendants say the value of the services rendered and interest on money advanced should be applied against the consideration owed on the shares. I believe such equities are sufficiently recognized by permitting defendants to retain the shares if they so elect, in view of their admitted increase in value. Defendants may designate their election in the judgment to be entered. Robert says that $500 was in fact advanced to the corporation prior to the adoption of the resolution in question and should be credited. The evidence persuades me that at least this sum was advanced and I conclude that it may be applied against the consideration owed.

Since they are not discussed in the briefs of the individual defendants, I assume that they have abandoned their defenses based on acquiescence, estoppel and laches.

We come next to plaintiffs' contention that the four identified individual defendants are jointly and severally liable to the corporation for the $40,000 in loans made by the corporation to Robert. The total was borrowed at various times commencing in October 1950. With respect to these loans plaintiffs seek only their repayment with interest. The facts show that Robert borrowed some $40,000 from the corporation at various times. He gave the corporation his unsecured judgment notes which provided for interest at $4\frac{1}{2}\%$. In view of 8 *Del.C.* § 143 [2] these defendants necessarily concede that the loans were made in violation of that statute. I agree with defendants that Robert borrowed this money in complete good faith and without

---

2. "No loans shall be made by a corporation to its officers or directors, and no loans shall be made by a corporation secured by its shares, and if any such loan be made, the officer or officers who make it or assent thereto shall be jointly and severally liable until the repayment of the sum so loaned with interest. The provisions of this section shall not apply to corporations organized exclusively as building and loan associations."

knowledge that such loans were prohibited. I also believe that the same can be said of the other directors who authorized the various loans.

Defendants say that in view of the innocence of the directors, the court should refuse to enforce what they characterize as the penal provisions of 8 *Del.C.* § 143. I am unable to see how this court is entitled to ignore the clear language of the statute merely because the defendants were ignorant of its existence. Defendants suggest that because this case is being considered by a court of equity it should refuse to inflict any penalty. I cannot see how the requirement that the defendants immediately repay the loan with interest can be said to be anything more than the statute demands. Compare *Graham v. Young*, 5 *W.W.Harr.* 484, 167 *A.* 906. I am unable to agree with defendants that the court can permit the loan to continue on the theory that the court has the power to do so in the exercise of its discretion. It follows that Robert, Bessie, Emma and Rebecca are jointly and severally liable to the corporation for the $40,000 in loans made to Robert.

But defendants say that the interest thereon should be no greater than the 4½% provided for in the judgment notes executed by Robert. The statute requires that the sums so borrowed shall bear interest until repayment but it does not fix the rate of interest. I believe the legal rate of interest, namely 6%, should apply. See 6 *Del.C.* § 2301 and *National Lock Co. v. Hogland*, (7 *Cir.*) 101 *F.2d* 576. This rate of interest appears to be the accepted rate in the absence of specific considerations not here applicable. This court assessed "lawful interest" in a similar transaction in *Loft, Inc. v. Guth*, 23 *Del.Ch.* 138, 2 *A.2d* 225, as an examination of the order entered on that opinion will reveal.

I therefore conclude that the parties above mentioned are jointly and severally liable for the amount of the loans plus interest at 6% from the date of the loans to the date of repayment. Of course, interest payments actually made will be applied against this sum.

Finally, I consider plaintiffs' charges with respect to certain real estate purchased from the corporation by one or more of the individual defendants.

■ On July 29, 1948, the corporation transferred to Robert 22 lots in Section F, and an account receivable was set up on the corporation's books in the amount of $995.93. It is still unpaid. The agreed fair market price for such lots at the time was $8,800. Shortly thereafter Robert built four houses on 10 of these lots. Two are now known as Nos. 1300 and 1302 Newport Pike. On March 4, 1949, these houses were sold for sums which resulted in an agreed profit of $5,543.38. Plaintiffs seek to recover this profit, together with interest, on the theory that Robert diverted this opportunity to his personal benefit and thus deprived the corporation of the opportunity to make the indicated profit. See *Guth v. Loft, Inc.*, 23 *Del.Ch.* 255, 5 *A.2d* 503.

Defendants say that these lots were purchased by Robert in good faith on the basis that Robert and his sisters did not feel that the risk of additional construction should be undertaken by the corporation. It is admitted that the consideration placed on the corporate books for the lots was substantially less than their then fair value. However, defendants claim that the buildings tended to improve the appearance of the neighborhood and helped to enhance the value of the Pleasant Hills development which was then being operated by the corporation.

These defendants concede that they have the burden of justifying this transaction because of the relationship of Robert, as president of the corporation, to the corporation. In view of the fairly healthy financial condition of the corporate defendant at the time and the fact that the corporation was engaged in the business of erecting and renting and selling real estate, I am forced to the conclusion that this was the type of opportunity which Robert was under a duty to exercise for the benefit of the corporation. The reasons given in defense of the transaction unfortunately cannot be accorded recognition where there is stockholder objection. It is part of the tragedy of this case that it involves a family dispute which is being "fought out" in this corporate litigation. As heretofore indicated, there is much to be said in practical defense of the actions of Robert and his sisters but such actions cannot be accepted when they are found to be contrary to various applicable laws.

As to 1300-1302 Newport Pike, defendants say that the court at best should only charge Robert for the difference between the amount he agreed to pay for the lots and the then fair value of the lots. I cannot agree. Where a party in Robert's position has benefited by taking to himself an opportunity which fairly belonged to the corporation then the corporation is entitled to the benefit obtained. The cases uniformly demonstrate this to be so. Compare *Guth v. Loft, Inc.,* above. Plaintiffs are entitled to the relief requested with respect to the 1300-1302 Newport Pike transaction.

As to the balance of the lots sold by the corporation to Robert in 1948, plaintiffs seek to recover the agreed difference between the book value of the sale and the then market value. Plaintiffs also attack the transfer from the corporation to Bessie and Emma in 1949, as joint tenants, of two lots which the corporation's books show as an account receivable in the sum of $184.06. The parties agree that the fair value of such property at the time was $2,000. Bessie and Emma were corporate directors at the time.

Once again the individual defendants involved concede that all of these lots were taken for the price indicated and have now admitted that they were taken below their fair market value. So far as I can see the defendants defend themselves by stating that they were motivated by a desire to improve the appearance of the development and because the corporation was then allegedly short of working capital. I do not believe that directors are entitled to sell corporate assets to themselves at less than their fair value, other considerations aside. I gather that individual defendants' counsel makes no real attempt to justify such transactions. He says that if the sales are condemned by the court, then the court should direct that the unimproved lots should be impressed with a trust with a further direction that they be reconveyed to the corporation. Plaintiffs on the other hand seek a judgment in the corporation's favor for the difference between the amount charged and the fair market value.

With respect to 1304 and 1306 Newport Pike, Robert will be required to pay the difference between the value stated and the actual value of such properties at the date of the sale plus interest. The

same is true as to Bessie and Emma with respect to No. 9 and No. 11 Kentucky Avenue. As to the remaining lots, the corporation would normally be given an option to choose a money judgment or the return of the lots with proper credits to Robert. Since these defendants control the corporation I think the matter can only be resolved by the court, and so I determine that Robert must pay to the corporation the difference in value, plus interest, rather than return the lots.

Order on notice.