**Frank ENTEL and Goldie Entel,**
**Plaintiffs,**

**v.**

**Ira GUILDEN et al., Defendants.**

United States District Court
S. D. New York.

Oct. 30, 1963.

Abraham I. Markowitz, New York City, for plaintiffs.

Jacobs, Persinger & Parker, New York City, for defendants Waldo M. Hatch and John C. Paige & Company, Inc.

Simpson, Thacher & Bartlett, New York City, for defendants Oswald L. Johnston, Eugene S. Northrop and David A. Stretch.

Stroock, Stroock & Lavan, New York City, for defendant Ira Guilden.

Bisco, Winkler & Higgiston, New York City, for defendant Atlas Corp.

TYLER, District Judge.

Plaintiffs Frank and Goldie Entel are, and during the period complained of were, holders of warrants issued by defendant Atlas Corporation ("Atlas"), an investment company which, at all times pertinent to the complaint, was registered under the Investment Company Act of

1940.[1] These warrants entitle holders to purchase shares of Atlas common stock at a fixed price ($6.25), with no limit on the period during which the option may be exercised.

The warrants are negotiable; indeed, they are listed and actively traded on the American Stock Exchange and are also traded on the Pacific Coast Stock Exchange. When the market price of the stock is higher than the warrant price, therefore, the market value of the warrants is close to the difference between the market price of Atlas common and the fixed price for which Atlas common can be purchased with the warrant.[2] If the value of Atlas common declines, the value of the warrant declines by substantially the same sum until the stock sells on the market for near or under its warrant price,[3] at which point the value of the warrant is solely dependent upon expectations of a future rise in value of the stock. An Atlas warrant, thus, can be fairly described as a "distilled" share of Atlas common—the sweet liquor of speculation concentrated with some of the dregs of investment "responsibility" left behind.[4]

Plaintiffs seek to recover, for the benefit of Atlas, commissions on insurance contracts which were made by Atlas and its subsidiaries. These commissions were received by the defendant Waldo M. Hatch, and by John C. Paige & Company, Inc. ("Paige"), an insurance brokerage company of which Hatch was president, a director, and a substantial stockholder, and which acted as broker for Atlas in placing the insurance contracts. Plaintiffs allege that Hatch and the other individual defendants constituted the board of directors of Atlas at the times complained of, that thus the receipt by Hatch and Paige of commissions from the insurers for their services was unlawful under Section 17(e) (1) of the Investment Company Act of 1940 ("the Act") [15 U.S.C. 80a–17(e) (1)], and that the amount of such commissions should be accounted for and returned to Atlas.

It is further alleged that all members of the Atlas board of directors knew or should have known of the illegality of the payments, and that therefore they violated their fiduciary duties by permitting the insurance contracts for which the commissions were paid to be made; no request for relief, however, is made against the directors other than Hatch.

Upon the basis of answers made by plaintiffs to interrogatories, which show plaintiffs to be warrant holders only, and not stockholders, defendants other than Atlas[5] have moved to dismiss under Rules 12(c) and 23(b) of the Federal

---

1. Atlas has since become an "operating" rather than an "investment" company, and on July 16, 1962, terminated its registration under the 1940 Act.

2. Various factors other than mere "stickiness" of the marketing system account for a failure of an exact equation. Thus, the capital outlay required to buy the stock is greater, but this may, or may not, be counterbalanced by expectations of dividends.

3. On October 28 of this year Atlas common closed at 3½ on the New York Stock Exchange, and the warrants closed at 1½ on the American Stock Exchange, according to the New York Times of October 29.

4. The Atlas Corporation has for many years used perpetual warrants as a major means of acquiring equity capital. The latest Standard & Poor Standard Corporation Descriptions report (Oct.-Nov. 1963 at 2451–52) indicates that of a total of 17,500,000 outstanding shares of common, 5,023,213 were reserved for possible distribution to holders of the perpetual warrants.

The Marvin Scudder collection at Columbia University's Butler Library shows the following history of these warrants: In 1956, pursuant to mergers and a stock split, 1,386,164 outstanding $25 warrants were split to 5,544,656 of the present $6.-25 warrants. It would seem that at least since 1933 and until the split in 1956 there were well in excess of 1,-000,000 of the $25 warrants outstanding at all times, with Atlas either buying some on the market and re-issuing them later, or issuing new warrants as some old ones were exercised, or doing both. The American Stock Exchange listing of the warrants dates to 1940.

5. With the exception of George E. Allen and Robert L. Stearns, who seem not to have been served in this case.

Rules of Civil Procedure, or, in the alternative, for summary judgment under Rules 56 and 23(b) of the Federal Rules of Civil Procedure. The theories relied upon by defendants in making these motions are that there is no private right of action for the benefit of an investment company under Section 17(e) of the Act, and that if there be such a right, it cannot be exercised in a derivative suit by those who do not hold stock.

First there will be considered defendants' contention that plaintiffs' claim is vitiated by the plain language of Rule 23 of the Federal Rules of Civil Procedure. Rule 23(b) states in part:

> "In an action brought to enforce a secondary right on the part of one or more shareholders in an association, incorporated or unincorporated * * the complaint * * * shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law * * *."

Defendants' reliance upon Rule 23(b) of the Federal Rules of Civil Procedure for the proposition that plaintiffs must be stockholders is misplaced. Plaintiffs' claim for relief is essentially based upon substantive law enacted by Congress. Whether the law accords warrant holders a right to sue on behalf of an investment company is a matter not substantially affected by the Federal Rules, which do not "abridge, enlarge or modify any substantive right." [6] Thus, it has been held that, notwithstanding Rule 23(b), the question of who is a stockholder for the purpose of suit is to be determined by substantive state law,[7] and that stock ownership need not have existed at the time of the wrong sued upon if such law does not so require.[8]

Any significance of Rule 23(b) to this question, therefore, would be not that it rules out a derivative action by a warrant holder but that it is an expression of the generally accepted proposition that only shareholders may bring derivative suits.[9]

The rationale, of course, for this rule is that, since each shareholder has a separate right to a share of corporate property upon dissolution, the interest of each shareholder in corporate assets, including choses in action, is "proprietary". Because the shareholder thus "owns" *pro rata* his share of the corporate assets, he may sue to protect his proprietary interest when corporate management fails or refuses to do so. This rationale for derivative litigation, however, is weakened, if not vitiated, by the fact that, prior to liquidation at least, one of the few direct incidents of proprietorship over corporate assets which a shareholder may exercise is that of maintaining such derivative suits; thus, to speak of proprietorship tends merely to describe the practice in different words.

A more meaningful reason for allowing derivative suits by shareholders is that such suits provide a means of protection against "insiders" who wrongfully injure the corporation, but who, because of their controlling positions, are capable of preventing the corporation itself from bringing suit. It is in this context, then, that it is necessary to inquire further into the distinctions between stock and these warrants in order to determine whether a similar or a different degree of such protection is appropriate.

One of the chief economic functions of a corporation, obviously, is to facilitate aggregations of capital. To further this function, there has developed a broad range of modes of investment within the corporate framework. Each such mode

---

6. 28 U.S.C. § 2072.

7. Gallup v. Caldwell, 120 F.2d 90 (3d Cir., 1941), Bankers Nat. Corporation v. Barr, 7 F.R.D. 305 (S.D.N.Y.1945).

8. Fuller v. American Machine & Foundry Co., 95 F.Supp. 764 (S.D.N.Y.1951);

See 3 Moore's Federal Practice at 3500. Kaufman v. Wolfson, 136 F.Supp. 939 (S.D.N.Y.1955), holds contra.

9. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 321, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

is a bundle of legal rights and duties; the market price for each bundle is no doubt determined at least in part by what the bundle contains. Thus, courts should act with conservatism in changing the content of any of these bundles in ways which would give the holders of some bundles less, and holders of other bundles more, than was bargained for in the marketplace.

Thus, however tautological the dogma that shareholders are the only "owners" of a corporation, and hence the only class of security holders who may bring derivative actions for the benefit of the corporation, the exercise of this dogma is presumably a factor in the price differentials between stock prices and those of other securities such as warrants. It is to protect those who relied upon this state of the law, rather than to protect any legal fiction, that the law should remain stable in this area, and should, moreover, when entering analogous areas, achieve a like allocation of rights in the absence of strong countervailing considerations.

On the other hand, warrants are used, as they are by Atlas Corporation, as a separate form of equity in corporations. Presumably, this usage stems from a desire of the investment community for what here has been called "distilled stock", offering more risk and more potential gain per dollar than common stock. The creation of varied modes of investment—different sized bundles of rights—which are calculated to encourage the total flow of capital into corporate aggregations should be facilitated in a society which depends largely upon the gathering of private capital to achieve economic expansion. Therefore, if equity content is poured into the mold of warrants by investors and investment bankers, the courts should not be reluctant to deny a measure of protection to holders of warrants which is adequate to sustain such use of the form. In other words, some protection should be afforded to a class which provides permanent capital in an enterprise as against wrongful acts by those who manage the enterprise. The economic function of this protection is to retain and encourage the availability of such capital. The facts that warrants traditionally, albeit somewhat loosely, have been deemed more akin to options than to shares of stock and that only holders of the latter class of security have usually instituted derivative suits cannot and should not bar this court from assessing the features of these warrants which render them essentially equity securities and the concomitant legal rights of their owners.

The inquiry, then, perforce leads us to consideration of the nature and purposes of the Investment Company Act of 1940 in order to determine whether there is a right enforceable by private action under Section 17(e), and whether, if there is such a right, the vindication thereof is so analogous to the typical derivative suit coming under Rule 23(b) that the sanctions of that Rule ought to apply here as a matter of policy.

Section 17(e) (15 U.S.C. § 80a–17(e)) provides, in part, that:

"It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person—

"(1) acting as agent, to accept from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale of any property to or for such registered company or any controlled company thereof, except in the course of such person's business as an underwriter or broker; *   *   *."

Section 43 (15 U.S.C. § 80a–44) provides, in part, that:

"The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created

by, or to enjoin any violation of, this subchapter or the rules, regulations, or orders thereunder."

■■ Thus, neither § 17(e) nor the general jurisdictional section expressly limit the vindication of rights and the enforcement of duties created by the Act to actions by the Securities and Exchange Commission. When a private duty is created by statute to benefit those engaged in certain activities, a member of the benefited class may maintain an action to enforce the duty. There is no doubt but that Section 17(e) was designed to protect such a special class; this may be seen from the declaration of policy in Section 1(b) of the Act:

"[I]t is declared that the national public interest and the interest of investors are adversely affected—

\* \* \* \* \* \*

"(2) when investment companies are organized, operated, managed, \* \* \* in the interest of directors, \* \* \* or other affiliated persons thereof \* \* \* or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders;

\* \* \* \* \* \*

"(4) \* \* \* when investment companies are managed by irresponsible persons;

\* \* \* \* \* \*

"It is declared that the policy and purposes of this subchapter, in accordance with which the provisions of this subchapter shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors. \* \* \*"

There are, moreover, repeated instances of private actions being allowed generally under the Securities Acts and Rules in the absence of specific statutory provisions therefor.[10] It seems clear,

then, that a private right of action can arise under Section 17(e) (1).

From the face of the Act itself, as quoted above, the purpose in making certain actions, including those in Section 17, "unlawful" was to protect the interests of those risking their capital in investment companies who would be hurt by the overreaching of insiders. As noted at the outset, warrant holders could be damaged in their investment by about the same dollar value per share as stockholders; indeed, it can be said that such a damage would be a greater proportion of their total investment than in the case of stockholders. Moreover, the definition of "security" in Section 2(a) (35) of the Act (15 U.S.C. § 80a–2(a) (35)) explicitly includes any "warrant or right to subscribe to or purchase" any stock.

The Act is broadly remedial, and circumscribes the investment company business with laws and regulations to an extent exceptional even in the highly controlled securities field. The law of investment companies is, therefore, now a specialized subject, and is generally recognized as such. General expectations as to the rights otherwise allocated to stock and warrant holders thus should not have carried over to the investment company area as strongly as they may have in other areas, especially in light of the identical treatment given to stocks and warrants as "securities" by the plain terms of the 1940 Act.

■ Particularly in view of the strongly expressed intent of the Investment Company Act to benefit "investors" and "all classes of security holders", the balance of economic policy lies with permitting this claim to be heard. I hold, then, that Section 17(e) creates a private right of action for the benefit of an investment company which may be exercised secondarily by plaintiffs as the holders of the warrants in question.

The motions to dismiss and for summary judgment are denied. So ordered.

10. See the discussion of these cases in Brown v. Bullock, 194 F.Supp. 207 (S.D. N.Y.1961), aff'd. 294 F.2d 415 (2d Cir., 1961), in which the court found private actions to lie under several sections of the Investment Company Act of 1940.