**Albert HOFF and Karen L. Hoff, Plaintiffs,**

v.

**Gerald SPRAYREGAN, Lawrence N. Hurwitz, Edward T. Chappell, Charles Erdman, Stephen D. Fuller, Charles Katz, Sprayregan & Co., Inc. and Technical Tape, Inc., Defendants.**

**No. 69 Civ. 4717.**

United States District Court, S. D. New York.

March 25, 1971.

dle District of Pennsylvania sits in Dauphin County.

**244**

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs; Donald N. Ruby, Marvin Luboff, Robert M. Kornreich, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for defendant, Technical Tape, Inc.; Allan Blumstein, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendants, Gerald Sprayregan, Lawrence N. Hurwitz and Sprayregan & Co., Inc.

Baker, Nelson, Williams & Mitchell, New York City, for defendants Edward T. Chappell, Charles Erdman, Charles Katz and Stephen D. Fuller.

## OPINION

FRANKEL, District Judge.

Plaintiffs, presenting themselves as "stockholders," bring this as a derivative action on behalf of the nominal defendant Technical Tape, Inc. They recount as bases for the suit events beginning in April and extending into August of 1969. The corporation, far from appreciating these efforts ostensibly for its benefit, moves to dismiss the complaint, citing Fed.R.Civ.P. 23.1 and asserting that plaintiffs were not, as the Rule requires, shareholders "at the time of the transaction of which" they complain.[1] The resulting dispute requires some description of plaintiffs' investment in Technical Tape and of the facts they allege as wrongs.

On March 11, 1969, the plaintiffs invested $10,000, and on May 27, 1969, another $12,000 in 6% convertible subordinated debentures of Technical Tape due October 1, 1982. Among the rights they thus acquired was the option, expiring July 16, 1969, to convert the debentures into shares of the company's common stock at the conversion price of one share of stock for each seven dollars principal amount of debentures. The plaintiffs exercised this option by documents they executed and transmitted on July 11, 1969, and the records of the corporation's transfer agent show an account opened on their behalf on July 15, 1969. In opposition to the motion to dismiss their complaint, plaintiffs contend that they were "shareholders" within the meaning of Rule 23.1 from the time they acquired the convertible debentures, and that, in any event, the wrongs of which they complain continued after mid-July 1969, when there is no question of their status as shareholders in the most conventional and familiar sense. The corporation disputes the contention that plaintiffs were shareholders while they held the debentures. Secondly, while not questioning their status as shareholders after July 15, 1969, the corporation argues that the assertedly unlawful transactions giving rise to the complaint had been completely accomplished by the middle of June 1969, and that plaintiffs cannot achieve standing on their theory of "continuing wrongs."

Turning, then, to the charges in the complaint: Plaintiffs invoke the court's jurisdiction under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, diversity of citizenship and the principles of pendent jurisdiction. They allege that their action arises under § 10 (b) of the 1934 Act, 15 U.S.C. § 78j(b), S.E.C. Rule 10b-5, 17 CFR 240.10b-5, "and common law principles." As of June 5, 1969, it is alleged, Technical Tape had 2,613,973 shares of common stock outstanding, these being traded on the American Stock Exchange, and each share being entitled to one vote. It is alleged that defendants Gerald Sprayregan and Lawrence N. Hurwitz, at the times in question, were directors of Technical Tape, and, respectively, chairman of the board and president of defendant Sprayregan & Co. On April 16, 1969, the complaint states, Sprayregan & Co. acquired 300,000 shares of Technical Tape common stock and an option to purchase an additional 100,000 shares at a price of nine dollars per share from the widow of the founder of

---

1. Other defendants, the ones actually charged with wrongful behavior, have filed brief statements of counsel announcing that they join in the corporation's motion, but the corporation, through its counsel, has done the work of initiating, briefing and arguing.

Technical Tape. The shares thus bought, together with those under the option (valid until April 1970), comprise about 17.5% of the outstanding voting stock of Technical Tape. In addition to these, defendant Gerald Sprayregan beneficially owns 15,000 shares. As a result of the foregoing purchase, Sprayregan & Co. came to dominate the Technical Tape board, placing thereon the individual defendants Sprayregan and Hurwitz.

On or about May 28, 1969, it is alleged, "Sprayregan & Co. caused Technical Tape to enter into an agreement with Sprayregan & Co. in which Technical Tape agreed to pay a 5% commission to Sprayregan & Co. in cash for any successful private placement of Technical Tape's notes or securities with SMC Investment Corporation ('SMC') and in addition to issue to Sprayregan & Co. 20,000 warrants to purchase 20,000 shares of common stock of Technical Tape at $9.00 per share for every 1,000,-000 of notes and securities so placed." Then, on June 6, 1969, "Sprayregan & Co. caused Technical Tape to enter into an agreement with SMC which provided for the issuance by Technical Tape to SMC of up to $5,000,000 principal amount of 7½% Exchangeable Subordinated Notes due June 6, 1971 (Notes) at a purchase price of $5,000,000. The agreement also provided that the Notes issued to SMC would be exchanged for shares of Series A Exchangeable Preferred Stock (Preferred Stock) if the proposal of Technical Tape to authorize 714,286 shares of said Preferred Stock was approved by the stockholders of Technical Tape. On or about August 8, 1969, the shareholders of Technical Tape authorized the aforesaid shares of Preferred Stock." In addition, on or about August 15, 1969, SMC purchased in a private placement $5,000,000 worth of the preferred stock thus authorized from Technical Tape. As a result of that $5,000,000 purchase and under the agreement of May 28, 1969, Sprayregan & Co. has received $250,000 in cash plus warrants to purchase 100,000 shares of Technical Tape common stock at nine dollars per share. At the time of the May agreement, this common stock was selling at between $11 and $12 per share on the American Stock Exchange so that the warrants were worth over three dollars each, or a total in excess of $300,000. These arrangements gave Sprayregan & Co. compensation which, according to plaintiffs, exceeds customary fees for services of the kind it rendered and is "grossly in excess of the value" of such services. This represents "an unlawful diversion, gift and waste of the assets of Technical Tape for the benefit of Sprayregan & Co." It is charged that the amount of such compensation is in itself "so grossly excessive as to lead to the conclusion that it was not due to an honest error judgment [sic] but rather to bad faith and a wilful and reckless disregard of the rights of Technical Tape and its stockholders."

The complaint goes on to allege violations by Sprayregan & Co. and the individual defendants of Section 10(b) of the 1934 Act and Rule 10b–5 thereunder. As assorted specifications under this heading, the complaint charges a failure by Sprayregan & Co. and individual defendants Sprayregan and Hurwitz to disclose to the other Technical Tape directors the excessive character of the compensation agreed to be paid to Sprayregan & Co. The individual defendant directors are charged with failure "to exercise due care, skill and diligence in conducting the business of Technical Tape * * *." It is said that their conduct "has been fraudulent and grossly negligent." There is a demand for compensatory damages "in excess of $450,000," exemplary damages, and other varieties of relief.

While there is a passing reference in the movant's papers to possible infirmities in the complaint as a matter of substance, there is no issue at this time as to the adequacy of the complaint to state a claim upon which relief can be granted.

The only question now presented is whether plaintiffs had the requisite status as shareholders "at the time of the transaction" of which complaint is made.

 On this exclusive and narrow subject, the court concludes that plaintiffs should prevail on both branches of the argument they make.[2] While a convertible debenture of the kind in question is obviously a hybrid, the interest of its holder in the corporation's stock is sufficient for our purposes to satisfy the requirement of Rule 23.1. The 1934 Act, implicated by the complaint herein, defines such a debenture as an "equity security," 15 U.S.C. § 78c (a) (11), and it is appropriate in cases involving Rule 23.1 to look to the underlying substantive law for a definition of "shareholder." 3B Moore, Federal Practice ¶ 23.1.17. The rule may not serve as a barrier to suit by a plaintiff given standing by a substantive federal statute. Blau v. Mission Corp., 212 F.2d 77, 79 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). On cognate principles, it is appropriate to apply the rule in light of pertinent terms and standards suggested by the statute sued upon. A warrant, defined in § 2(a) (35) of the Investment Company Act of 1940, 15 U.S.C. § 80a–2(a) (35), so that it resembles a convertible debenture in the definition mentioned above, has been held by this court to confer the status of "shareholder" within the meaning of Rule 23.1, after the court looked to the "broadly remedial" nature of the Act. Entel v. Guilden, 223 F. Supp. 129 (S.D.N.Y.1963). The court finds the cited decision of Judge Tyler persuasive and a close analogy for the case at hand.

Not always certain whether bad law is more likely to spring from hard or easy cases, the court notes the obvious substantiality of the $22,000 investment made by the plaintiffs in this case well before any of the events about which they sue. It is plain that their interest in the stock of the corporation from the inception of their investment was real and far weightier than that of a holder of, say, 100 shares who would unquestionably be entitled to maintain the action. To allow standing to plaintiffs like these generates no trace of the problems or evils against which Rule 23.1 is directed.

 Alternatively, the court would hold, in any event, that the wrongs charged in the complaint continued beyond the point when plaintiffs undisputedly became shareholders, and that this would entitle them to sue even if their requisite status dated only from the middle of July, 1969. The consummated injury of which plaintiffs complain was the payment to Sprayregan & Co. of $250,000 and the issuance of warrants to the same defendant. Shareholder approval of the shares issued to SMC was not obtained until August 8, 1969; without the issuance of this stock, it is questionable whether Sprayregan & Co. would have been entitled to its commis-

---

2. Both sides have seen fit to spare the court any burdensome thoughts about whether the problem is one of substance or procedure, cf., e. g., 3B Moore's Federal Practice ¶ 23.1.01[4] (2d ed.), and, if substance, what law should be applied. There are no citations to the law of Michigan, where Technical Tape is incorporated, except for a citation in the movant's memorandum, Pergament v. Frazer, 93 F.Supp. 9 (E.D.Mich.1949), to show that the requirement of shareholder status at the time of the transactions in question is imposed under Michigan law as well as Federal Rule 23.1. The court, given the state of the submissions before it, finds no necessity for resolving finally the ambiguity of this situation. The result reached herein is to the best of the court's knowledge at this time nowhere contradicted by the law of any sovereign that might ultimately be thought to have a controlling interest.

sion. Cf. Lavine v. Gulf Coast Lease-holds, Inc., 35 Del.Ch. 539, 122 A.2d 550 (1956). Furthermore, $125,000 of the cash was not paid until August 15, 1969, and the warrants dated June 6 and August 15, 1969, were not actually issued until the latter date. Without the delivery of these portions of allegedly excessive compensation in August, plaintiffs might have no claim for relief whatever, so that the delivery is an essential part "of the transaction of which [they] complain * * *." Maclary v. Pleasant Hills, Inc., 35 Del.Ch. 39, 109 A.2d 830 (1954). The movant responds that these events in August were merely the fulfillment of contractual obligations; that Technical Tape would have been liable for a breach had it not thus performed; and that the total and completed wrong on which plaintiffs must count was the entry into these contractual arrangements, all antedating July 15, 1969. But this leaves out of account plaintiffs' central thesis, which we must project as ultimately demonstrable for purposes of the pending motion—namely, that the contract between Sprayregan & Co. and Technical Tape was infected in its inception by the fraudulent and otherwise wrongful behavior of the various defendants. On this assumption, there was nothing inevitable about the delivery by Technical Tape of the wrongfully agreed payments. There was, on the contrary, an obligation to disavow the unlawful obligations and to refuse to proceed further on their basis. In sum, no theory of prior completion or inevitability avoids the decisive point that the alleged illegality of later payments, even though due to agreements prior to stock ownership, is sufficient for purposes of Rule 23.1. Palmer v. Morris, 316 F.2d 649 (5th Cir. 1963). See also Lissauer v. Bertles, 37 F.Supp. 881, 884 (S.D.N.Y. 1940).

This is not to suggest, of course, any view one way or the other on the merits of this controversy. It is merely to point out that plaintiffs' characterization of their charges as showing "continuing wrongs" seems meritorious.

The motion to dismiss is denied. So ordered.