7547 PARTNERS, Plaintiff
Below, Appellant,

v.

Scott A. BECK, Saad J. Nadhir, Jeffry J.
Shearer, J. Bruce Harreld, Arnold C.
Greenberg, M. Howard Jacobson, Peer
Pederson and Boston Chicken, Inc. De-
fendants Below, Appellees.

No. 432, 1995.

Supreme Court of Delaware.

Submitted: May 21, 1996.
Decided: Aug. 19, 1996.

Joseph A. Rosenthal and John G. Day
(argued), of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Joel C. Feffer

and Richard B. Brualdi of Wechsler Harwood Halebian & Feffer LLP, New York City, for Appellant.

Henry E. Gallagher, Jr. (argued), and Anne L. Barnett of Connolly, Bove, Lodge & Hutz, Wilmington, for Appellees Scott A. Beck, Saad J. Nadhir, Jeffry J. Shearer, J. Bruce Harreld, Arnold C. Greenberg, M. Howard Jacobson and Peer Pederson.

Donald J. Wolfe of Potter Anderson & Corroon, Wilmington, for Appellee Boston Chicken, Inc.

Before VEASEY, C.J., HOLLAND, and BERGER, JJ.

BERGER, Justice:

In this appeal we consider the statutory requirement that the plaintiff in a derivative suit be a stockholder of the corporation at the time of the challenged transaction. 8 Del.C. § 327. Appellant, 7547 Partners ("Partners"), filed this derivative suit alleging that the directors of Appellee, Boston Chicken, Inc. ("Boston Chicken"), breached their fiduciary duties in authorizing a private placement that accompanied the initial public offering of Boston Chicken common stock (the "IPO"). The Court of Chancery relied on the prospectus issued in connection with the IPO (the "Prospectus") in holding that Partners lacked standing because it was not a stockholder of Boston Chicken at the time of the alleged wrongs. Partners contends that the Court of Chancery: (i) erred in its analysis of the timing of the alleged wrongs; (ii) improperly relied on documents outside the pleadings to resolve contested facts; and (iii) mistakenly applied 8 Del.C. § 327 to bar a "legitimate" claim. We hold that the trial court's rulings were correct in all respects and we affirm.

## I. Factual and Procedural Background

On November 9, 1993, Boston Chicken made an initial public offering of 1.9 million shares of its common stock at $20 per share. Boston Chicken concurrently sold 900,000 shares of its common stock to several of its directors and executive officers for $18.60

per share, the equivalent of the IPO price less an underwriter discount of $1.40 (the "Private Placement"). The company specified the pricing terms of the IPO and the Private Placement in its Prospectus, which was issued on November 8, 1993. Due to heavy demand for Boston Chicken stock, public trading opened at $45 per share and closed at $48.50 per share on November 9th. Partners purchased its 100 shares of Boston Chicken stock in the IPO.

On November 10, 1993, Partners filed a derivative action in the Court of Chancery alleging that Boston Chicken's directors were grossly negligent in setting the IPO price at the "absurdly low" amount of $20 per share. The complaint also alleged that, "by approving and acquiescing in the pricing of the [IPO]," the directors enriched Messrs. Beck, Nadhir, Shearer and Harreld (Boston Chicken's top executive officers) by permitting them to acquire the stock at a grossly inadequate price. The complaint charged that the company's directors "wasted Boston Chicken's assets and did not act independently, did not remove or properly resolve conflicts of interest, and did not exercise rational business judgment."

The Court of Chancery dismissed Partners' complaint for lack of standing. The trial court found that any wrongs arising from the pricing of the IPO must have occurred before Partners purchased its stock. As a result, Partners' complaint did not satisfy the statutory requirement of contemporaneous stock ownership. 8 Del.C. § 327.* Partners did not appeal that decision. Instead, it sought leave to file an amended complaint that would clarify Partners' claims and demonstrate its standing.

The proposed amended complaint (the "Amended Complaint") alleged that Boston Chicken's directors misused confidential information about the extraordinary demand for Boston Chicken stock to enrich themselves. The directors allegedly knew, when they authorized the Private Placement, that the demand for Boston Chicken stock would force the market price up and that they would "reap huge profits ... when they ac-

---

* The statute provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

quired Boston Chicken shares in the Private Placement." The Amended Complaint alleged that the directors' breaches of fiduciary duty "ripened and culminated in the delivery of shares pursuant to the Private Placement," which took place on November 16, 1993, at the same time that Partners received its shares.

In a bench ruling on August 3, 1995, the Court of Chancery denied Partners' motion to amend. The trial court held that the Amended Complaint did not cure Partners lack of standing. Although the Amended Complaint alleged that the wrongs occurred at the time the Boston Chicken stock was delivered to the directors, the trial court did not accept that conclusory allegation. Instead, the court found that the alleged wrongs took place at the time the directors agreed to the Private Placement pricing. Since the terms of the Private Placement were disclosed in the November 8 Prospectus and Partners purchased its stock in the November 9 IPO, the court concluded that the Amended Complaint would be subject to dismissal for lack of standing. As a result, Partners' motion for leave to amend was denied, as futile.

## II. The Timing of the Alleged Wrongs

■ Partners argues that the Court of Chancery erred in its analysis of when the alleged wrongs took place for purposes of 8 Del.C. § 327. Partners relies on *Maclary v. Pleasant Hills, Inc.*, 35 Del.Ch. 39, 109 A.2d 830, 834 (1954), for the proposition that the Boston Chicken directors' breaches of fiduciary duty were not completed until the directors received their Private Placement shares on November 16, 1993. Since Partners was a Boston Chicken stockholder as of that date, it argues that the contemporaneous ownership requirement of 8 Del.C. § 327 was satisfied.

We find that Partners' reliance on *Maclary* is misplaced. That was a derivative action seeking, among other things, the cancellation of 100 shares of stock allegedly issued without consideration. The resolution authorizing the issuance of those shares was passed before plaintiffs inherited their stock. However, the challenged shares were not actually issued until 3 years after the resolution, and more than 1 year after plaintiffs

became equitable stockholders. The *Maclary* court held that, under the facts of that case, the challenged transaction should not be deemed complete until the stock certificates actually were issued. The court stated:

[T]here is nothing in the policy behind [8 Del.C. § 327] which would call for a construction favoring its application in situations where inexcusable inaction on the part of corporate personnel might make it less likely that wrongdoing would be discovered. It would seem more likely that a wrongful issuance of stock would be discovered if the issuance thereof and the stock holdings appeared of record. To consider this transaction as having been completed prior to the issuance of the certificates would sanction an application of the statute not required by its language and not fairly required to effectuate its purpose. On the contrary, it would place a premium on corporate conduct which might run counter to desirable standards.

*Id.* 109 A.2d at 833.

The facts of this case bear no resemblance to *Maclary*. Partners is not seeking the cancellation of any Boston Chicken stock, nor is it alleging that the issuance of those shares was unlawful. In addition, there was no "inexcusable inaction" on the part of Boston Chicken. The Court of Chancery declined to follow *Maclary* after concluding that it was a special case in which a rule was crafted to meet unusual circumstances. We agree that *Maclary* is distinguishable and does not control the result here.

Rather, the timing of the allegedly wrongful transaction must be determined by identifying the "wrongful acts which [Partners] want[s] remedied and which are susceptible of being remedied in a legal tribunal." *Newkirk v. W.J. Rainey, Inc.*, 31 Del.Ch. 433, 76 A.2d 121, 123 (1950). The Amended Complaint is clear. It alleges that Boston Chicken's principal executive officers learned, during the IPO pricing negotiations, that there was an extraordinary demand for Boston Chicken stock. They misused that information by deciding to sell themselves stock in the Private Placement at a price the directors allegedly knew would be well below market price. In short, the Boston Chicken directors allegedly, "breached their fiduciary duties of loyalty and due care ... by partici-

pating in, permitting or acquiescing in the use of inside information proprietary to Boston Chicken to enable defendants Beck, Nadhir, Shearer and Harreld ... to acquire Boston Chicken stock in the Private Placement at a price far below fair market value." Amended Complaint, ¶ 15. Partners is challenging the "terms of the [Private Placement] rather than the technicality of its consummation...." *In re Beatrice Companies, Inc. Litigation,* Del.Supr., 522 A.2d 865 (1987) (ORDER). Thus, Partners must establish that it was a stockholder of Boston Chicken at the time the terms of the Private Placement were established.

### III. The Court of Chancery's Reliance on the Prospectus

■ After determining when the alleged wrongs occurred for purposes of 8 *Del.C.* § 327, the Court of Chancery used the Prospectus to establish that Partners was not a contemporaneous stockholder. This Court recently discussed the extent to which a trial court may consider documents outside the pleadings when ruling on the sufficiency of a complaint. *In re Santa Fe Pacific Corp. Litigation,* Del.Supr., 669 A.2d 59 (1995). "Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss." *Id.* at 68. However, "in particular instances and for carefully limited purposes," the trial court may consider documents referred to in the complaint. *Id.* at 69. For example, where there is a corporate claim based upon inadequate or misleading disclosures, a court may refer to the allegedly deficient corporate document to determine what was disclosed. *Id.* at 70. A trial court may also consider documents referred to in the pleadings, "to establish formal, uncontested matters." *Ibid.*

Partners argues that the Court of Chancery ignored *Santa Fe* by using the Prospectus to establish a hotly contested fact—that the Private Placement Agreement was executed before the Prospectus was issued. The problem with this argument is that it is founded on an inaccurate premise. The trial court made no findings about the date on which an agreement was signed. The court ruled that the wrongs alleged in the Amended Complaint occurred at the time the decision was made to sell the directors stock at $18.60 per share in the Private Placement. The Court of Chancery deduced that the wrongful decision must have been made prior to the date on which the Prospectus was issued, since the fact that there would be a Private Placement and the terms thereof were disclosed in the Prospectus. This is the sort of uncontestable fact that may be considered at the pleading stage even if not admitted by the plaintiff.

### IV. The Applicability of 8 *Del.C.* § 327

■ Finally, Partners argues that 8 *Del.C.* § 327 should not be construed to apply in this case, since Partners did not purchase its stock for the purpose of filing this claim. Partners notes that the statute was intended to prevent abuses that would arise if a party were permitted to purchase stock for the purpose of bringing a derivative action attacking a transaction that predates the purchase. *In re Beatrice Companies, Inc. Litigation, supra.* The Amended Complaint specifically alleges that Partners did not know of the alleged wrongs at the time it placed its order to buy Boston Chicken stock. Accordingly, Partners suggests that the purpose of § 327 would not be served by enforcing the statute in this case.

The short answer to this argument is that the statute does not include any provision exempting "good faith" purchasers from its terms. Partners is asking this Court to ignore the clear language of the statute under the guise of a "liberal construction." We decline to do so.

Based upon the foregoing, the decision of the Court of Chancery is AFFIRMED.

### ATTACHMENT

In the Supreme Court of the State of Delaware

In re Beatrice Companies, Inc. Litigation

Nos. 155 and 156, 1986

Court Below: Court of Chancery of the State of Delaware in and for New Castle County C.A. No. 8248

Submitted: November 6, 1986

Decided: February 20, 1987

Before CHRISTIE, C.J., HORSEY, and MOORE, JJ.

**164**

## ORDER

HORSEY, Justice.

This 20th day of February, 1987, upon consideration of the briefs of the parties, it appears to the Court that:

(1) Appellants, William Leighton ("Leighton") and Joseph A. and Shirley S. Yablonski ("the Yablonskis"), appeal from a decision of the Court of Chancery approving the settlement and dismissal of consolidated stockholders' class and derivative actions against Beatrice Companies, Inc. ("Beatrice"); its Board of Directors; James L. Dutt, a former officer of Beatrice; Kohlberg, Kravis, Roberts & Co. ("KKR"); and Joel E. Smilow, a member of the KKR investment group. The settlement disposed of all claims arising out of the acquisition of Beatrice, through a leveraged buy-out, organized by KKR.

(2) On October 16, 1985, KKR submitted to Beatrice's Board of Directors an offer to acquire the company in a transaction in which Beatrice's stockholders would receive $40 in cash and preferred stock valued at $5 per share for each share of Beatrice common stock. The Board, however, after consulting its investment bankers, unanimously rejected the offer as inadequate.

(3) On October 29, 1985, KKR made a second proposal in which it increased its offer to $40 in cash and $7 in market value of preferred stock. The Board authorized management to begin discussions with KKR in respect to its revised offer and to explore alternatives that would maximize the value of Beatrice to its stockholders. Thereafter, Beatrice's investment bankers contacted approximately seventy-five potential buyers to determine whether they were interested in acquiring all or part of Beatrice. In response to these inquiries, Dart Group Corp. expressed an interest in acquiring Beatrice for $48 per share in cash.

(4) On November 12, 1985, KKR made a revised offer to acquire Beatrice in a transaction consisting of $43 in cash and preferred stock valued at $7 per share. This offer, however, contained the following conditions: (a) a provision (the "Termination Payment Provision") that, if the acquisition was not completed and another party ac- quired thirty percent of Beatrice's common stock or made a firm proposal to acquire Beatrice for more than $50 per share, KKR would be entitled to a cancellation fee of $123 million; and (b) a provision (the "Asset Option Provision") granting KKR an option to purchase either Beatrice's grocery food and Tropicana subsidiaries for $2.391 billion or certain alternative assets, including the Tropicana subsidiary, for a price of $2.412 billion. The November 12 offer was conditioned upon its acceptance by the Board by no later than November 13, 1985.

(5) On November 13 and 14, 1985, at a special Board meeting, Beatrice's investment bankers indicated that from a financial point of view, KKR's November 12 offer was fair to Beatrice's stockholders. The Board also learned that the Dart Corp. had withdrawn its earlier offer. Additionally, KKR agreed to cause Beatrice, after the proposed merger, to honor amendments to existing executive compensation and severance agreements that the Board had authorized prior to the initial KKR proposal.

(6) On November 14, 1985, the Board accepted KKR's November 12 offer and entered into (a) a merger agreement with BCI, a corporation KKR formed for the acquisition, which included the Termination Payment Provision; and (b) a separate agreement with BCI adopting the Asset Option Provision. The merger agreement also prohibited the solicitation of alternative proposals or offers for Beatrice or any of its subsidiaries.

(7) Plaintiffs filed nine class and derivative claims in the Court of Chancery and seven related actions were filed in Illinois. These actions were subsequently consolidated in this proceeding. The complaints basically alleged (a) that Beatrice's officers and directors, aided and abetted by KKR, had breached their fiduciary duties to the Beatrice stockholders in entering into the merger agreement and the executive compensation and severance agreements; and (b) that the Termination Payment Provision was excessive and illegal and the Asset Option Provision invalid. Plaintiffs sought damages, an order enjoining the operation of the Termination Payment and Asset Option Provisions;

and an order enjoining consummation of the proposed merger.

(8) Following extensive negotiations between Beatrice, KKR, and the plaintiffs, the parties entered into a memorandum of understanding on February 1, 1986. The memorandum: terminated the agreement containing the Asset Option Provision; reduced the $123 million Termination Payment Provision to approximately $19 million; revised the merger agreement to delete the no-shopping provision, thus, allowing Beatrice to solicit other offers or proposals; confirmed Beatrice's right to pay a cash dividend of up to $.45 per share of common stock; and increased the annual interest rate on the BCI preferred stock issue in connection with the merger from 14 percent to 15-¼ percent to be paid on a quarterly instead of a semiannual basis. Beatrice and its executives also agreed to reductions of $23 million in their executive compensation and severance agreements.

(9) On March 11, 1986, the parties entered into a stipulation and agreement of settlement in accordance with the terms of the memorandum. Thereafter, the Court of Chancery certified a class consisting of all Beatrice stockholders at the close of business on February 20, 1986 (the record date for the stockholder vote on the proposed merger) and ordered a hearing to determine if the settlement was fair and adequate. Notice of the hearing was mailed to the February 20 holders of record, advising them of their right to appear and object.

(10) Although Leighton and the Yablonskis did not appear at the hearing, both parties submitted written statements objecting to the settlement. Leighton objected on the grounds that BCI was in violation of various provisions of the federal securities laws. The Yablonskis challenged the certification of the class, the conduct of the parties' attorneys, the adequacy of the terms of the proposed settlement, and the plaintiffs' attorneys' fee request.

(11) After careful review, the Court of Chancery determined that the benefits provided to Beatrice and the class constituted "fair and reasonable compensation for the claims." The Court also found the applica-

tion of plaintiffs' counsel for attorneys' fees to be "fair and reasonable in the light of the work involved, the contingent nature of the undertaking and the other appropriate factors." Thereafter, on April 16, 1986, the Court entered an order dismissing the claims with prejudice.

(12) On appeal, Leighton raises numerous arguments, many of which were not raised below, based upon provisions of the federal securities laws. Leighton, however, concedes that he did not purchase his Beatrice stock until sometime after: (a) the time of the Beatrice directors' alleged breach of fiduciary duty; (b) February 20, 1986, the record date for the stockholder vote on the proposed merger; and (c) he reviewed the March 11, 1986 proxy statement and the terms of the merger and settlement.

(13) Under settled Delaware law, an objector who purchases a claim by buying stock after the alleged wrongdoing has occurred lacks standing to challenge the wrongdoing in a derivative capacity. *See* 8 *Del.C.* § 327; *Newkirk v. W.J. Rainey, Inc.,* 31 Del.Ch. 433, 76 A.2d 121, 123 (1950). Section 327 provides that a plaintiff cannot maintain a derivative action challenging corporate mismanagement unless he was a stockholder at the time of the transaction complained of or had his stock devolve upon him by operation of law. 8 *Del.C.* § 327. The purpose of this section is to prevent potential plaintiffs from purchasing stock in order to maintain a derivative action attacking a transaction which occurred prior to the purchase of the stock. *Schreiber v. Bryan,* Del.Ch., 396 A.2d 512, 516 (1978); *Jones v. Taylor,* Del.Ch., 348 A.2d 188, 191 (1975); *Newkirk, supra.*

(14) In the case of a proposed merger, the plaintiff must have been a stockholder at the time the terms of the merger were agreed upon because it is the terms of the merger, rather than the technicality of its consummation, which are challenged. *Newkirk, supra.* Therefore, Leighton clearly lacks standing to challenge derivatively the merger; and he concedes he does not meet class certification. Therefore, his claims must be dismissed.

(15) The Yablonskis assert essentially two arguments: *one,* the settlement was not fair and reasonable to the shareholders because

it extinguished valuable claims for inadequate consideration; and that as to absentee shareholders, the settlement procedures lacked due process; and *two*, that the Chancery Court abused its discretion in its award of attorneys fees.

(16) The Yablonskis' due process argument was not raised prior to or at the settlement hearing, which the Yablonskis did not attend. It was included in a post-hearing letter to the Court by the Yablonskis, taking exception to the

> proliferating abuse of the class action mechanism to extinguish legitimate damage claims, to insulate corporate wrongdoers from judicial scrutiny and to sanction the payment of grossly excessive, wholly-unwarranted attorneys fees to class counsel by an opposing party. My due process rights and the due process rights of thousands of other Beatrice stockholders require, at a minimum, close scrutiny if not presumptive invalidity of settlements such as the one involved here.

An examination of the record and of the Court of Chancery's careful consideration of the issues that were timely raised require rejection of the asserted due process claim as factually and legally unsubstantiated. Here, there is no assertion that the settlement procedure of the derivative and class suits did not fully comply with the controlling rules of the Court of Chancery, Rules 23 and 23.1. Thus, *Wied v. Valhi, Inc.*, Del.Supr., 466 A.2d 9 (1983), upon which the Yablonskis rely, is clearly inapposite.

(17) The Yablonskis' due process argument is simply an inarticulated use of a code word for their principal assertion that the settlement was "intrinsically unfair" and is, thus, subsumed within their argument *one*, attacking the fairness of the settlement to the Beatrice shareholders.

(18) Our standard of review of the settlement of a class or derivative action is well established. This Court should "review the record solely for the purpose of determining whether or not, by the exercise of his business judgment, the Chancellor abused his discretion." *Neponsit Inv. Co. v. Abramson*, Del.Supr., 405 A.2d 97, 100 (1979). It is not our function to determine the intrinsic fairness of the settlement or to exercise our own business judgment respecting its merits. *Polk v. Good*, Del.Supr., 507 A.2d 531, 536 (1986). Rather, we limit ourselves solely to the question of whether the Court abused its discretion in exercising its business judgment. *Polk, supra.* If its findings are supported by the record and are the product of an orderly and logical deductive process, they will be accepted. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

(19) The Court—after considering the benefits conferred on Beatrice's stockholders due to the negotiated changes, the financial improvements that the settlement contemplated, and the arguments of the stockholders who objected to the merger—concluded that the settlement was fair and reasonable. Based upon our review of the record, we find ample evidence to support the Chancellor's conclusion that "both Beatrice and the class . . . will receive real and substantial benefits from the settlement." Accordingly, the Court of Chancery did not abuse its discretion in approving the proposed settlement.

(20) Our standard of review of the Yablonskis' second argument, *two*, is whether the Court abused its discretion in its award of attorneys' fees. *Krinsky v. Helfand*, 38 Del.Ch. 553, 156 A.2d 90, 95 (1959). Here, the Court found "that the amount requested is fair and reasonable in the light of the work involved, the contingent nature of the undertaking and the other appropriate factors." The record discloses that the Court properly considered counsel's time and effort in the lawsuit and the Court's reasoning for its conclusion. It also weighed the amount of the award with the benefits the Beatrice stockholders received. Hence, we find no abuse of discretion and conclude that the Court properly approved the application for attorneys' fees.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery be and the same hereby is

AFFIRMED.