# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE SMILEDIRECTCLUB,    )     C.A. No. 2019-0940-MTZ
INC. DERIVATIVE LITIGATION    )

## MEMORANDUM OPINION
Date Submitted: February 17, 2021
Date Decided: May 28, 2021

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Lee Squitieri, SQUITIERI & FEARON, LLP, New York, New York; Jeffrey S. Abraham and Michael J. Klein, ABRAHAM, FRUCHTER & TWERSKY LLP, New York, New York; Donald J. Enright, Elizabeth K. Tripodi, and Jordan Cafritz, LEVI & KORSINSKY, LLP, *Attorneys for Plaintiffs.*

Edward B. Micheletti and Jenness E. Parker, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Scott D. Musoff, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, *Attorneys for Defendants.*

**ZURN, Vice Chancellor.**

Co-Lead Plaintiffs Kerry Harts and the Doris Shenwick Trust ("Plaintiffs") hold Class A common stock of SmileDirectClub, Inc. ("SDC"). Plaintiffs acquired their shares through SDC's initial public offering, through which SDC issued and sold 58,537,000 shares of Class A common stock at $23.00 per share (the "IPO"). The IPO launched on September 11, 2019, and closed on September 16. Plaintiffs purchased their shares on September 12.

In connection with the IPO, SDC's Form S-1 registration statement (the "Prospectus") disclosed that SDC intended to use the IPO proceeds to consummate certain insider transactions at the IPO price, and that doing so would dilute its public stockholders. The Prospectus explained those transactions would occur automatically if the IPO raised sufficient funds. The IPO was successful, so on the day it closed, SDC used most of the IPO's proceeds to consummate the intended insider transactions at the IPO price less the underwriting discount.

Plaintiffs challenge those insider transactions as unfair, alleging derivatively that SDC's board of directors (the "Board") breached their fiduciary duties by causing SDC to pay an excessively high price to consummate insider transactions that benefitted those Board members and their affiliated entities. Plaintiffs also assert related derivative claims for aiding and abetting and unjust enrichment.

The defendant Board members and their affiliates have moved to dismiss pursuant to Court of Chancery Rules 23.1 and 12(b)(6) (the "Motion"), contending,

1

*inter alia*, that Plaintiffs lack standing to pursue their derivative claims. For the reasons that follow, I agree and grant the Motion.

## I. BACKGROUND[1]

Defendants Jordan Katzman and Alexander Fenkell founded SDC Financial, LLC ("Financial," and together with SDC, the "Company") in 2014 "on one simple belief: everyone deserves a smile they love."[2] The Company provides dental support organization services with a pioneering direct-to-consumer medtech platform for orthodontic treatment, utilizing at-home impression kits and in-store scanning services. It manufactures clear aligners while using a network of state-licensed practitioners to approve cases remotely, disrupting conventional orthodontics and offering a 60% discount to doctor-directed competitors. The Company is the largest player in that market.

---

[1] I draw the following facts from the Consolidated Verified Stockholder Derivative Complaint, available at Docket Item ("D.I.") 13 [hereinafter "Compl."], as well as the documents attached to and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Defs.' Ex. —" refer to Defendants' exhibits in support of the Motion, available at D.I. 18 and D.I. 21. Citations in the form of "Prospectus —" refer to the SmileDirectClub, Inc. Prospectus dated September 11, 2019, available at Defs.' Ex. 1.

[2] Prospectus at 1.

**A.** **The Company Launches The IPO, And Discloses That It Will Consummate Certain Reorganization And Insider Transactions In Connection With It.**

Before the IPO, pre-IPO investors—including Defendants and Board members David Katzman, Jordan Katzman, Steven Katzman, Alexander Fenkell, Susan Greenspon Rammelt, and Richard Schnall—held membership units in Financial.[3] Financial and its subsidiaries in turn held and owned the Company's assets and operations.

In anticipation of the IPO, Financial prepared the post-IPO Company to conduct business through an "Up-C" structure.[4] That structure involves two tiers of ownership: through the IPO, public stockholders would hold stock in SDC, a corporation, which in turn would hold units in Financial, a limited liability company,

---

[3] The Katzmans, Fenkell, Rammelt, and Schnall served on the pre- and post-IPO Board. Plaintiffs have also named as Defendants post-IPO directors William H. Frist, Carol J. Hamilton, and Richard F. Wallman. In addition, Defendants include (1) CD&R SDC Holdings, L.P., which is affiliated with Schnall and received more than $49 million through the Insider Transactions, defined *infra*; (2) DBK Investments, LLC and the David Katzman Revocable Trust, which are entities controlled by David Katzman that received more than $198.4 million through the Insider Transactions; (3) the David B. Katzman 2009 Family Trust, for which Steven Katzman is trustee and David Katzman's descendants, including Jordan Katzman, are the primary beneficiaries, and which received more than $64 million through the Insider Transactions; (4) the Jordan M. Katzman Revocable Trust, for which Jordan Katzman is the trustee and beneficiary, and which received more than $157 million through the Insider Transactions; and (5) the Alexander J. Fenkell 2018 Irrevocable Trust and Alexander Fenkell Revocable Trust, for which Fenkell is the trustee and beneficiary, and which received more than $143.75 million through the Insider Transactions. *See* Compl. ¶¶ 13–16, 18, 22–28.

[4] Prospectus at 12; Compl. ¶ 41. A diagram depicting the Company's organizational structure as disclosed in the Prospectus is available at Defs.' Ex. 3.

alongside pre-IPO investors. As the first step in the Up-C reorganization, SDC was incorporated in Delaware in 2019 to become Financial's holding company. Then, Financial executed a Seventh Amended and Restated Limited Liability Company Agreement, dated and effective September 13, 2019 (the "LLC Agreement").[5] That agreement made SDC the sole managing member of Financial and recapitalized all existing LLC membership units into a new class (the "LLC Units").[6] SDC also issued Class B stock equal to the number of pre-IPO LLC Units held by each pre-IPO investor.[7]

SDC acquired Financial LLC Units, with each share of SDC common stock corresponding economically to an LLC Unit. SDC's sole material asset became its 27.4% equity interest in Financial. And as SDC's managing member, SDC

---

[5] *See* Defs.' Ex. 4.

[6] *See* Prospectus at 13 ("Prior to the closing of this offering, (i) SDC Inc. will acquire, pursuant to one or more mergers (the 'Blocker Mergers'), the Pre-IPO Units held by certain Pre-IPO Investors (the 'Blockers'), and will issue to the equityholders of the Blockers (the 'Blocker Shareholders') shares of Class A common stock as consideration in the Blocker Mergers; (ii) the operating agreement of SDC Financial (the 'SDC Financial LLC Agreement') will be amended and restated to, among other things, modify the capital structure of SDC Financial by replacing the different classes of Pre-IPO Units (including Restricted Units) with a single new class of membership interests of SDC Financial ('LLC Units')[.]"); Defs.' Ex. 4 (attaching as Exhibit 10.1 the LLC Agreement, which states that "the Pre-IPO Members have authorized [SDC] as Manager" and defining "Manager" as SDC).

[7] *See* Prospectus at 13 ("Prior to the closing of this offering, . . . (iii) we will issue to each of the Pre-IPO Investors previously holding Pre-IPO Units (including Restricted Units) a number of shares of our Class B common stock equal to the number of LLC Units held by it[.]").

4

controlled and indirectly operated Financial's business and affairs. Effectively, Financial served as the Company's operating entity, and in turn was held by SDC.

So poised, SDC launched the IPO. On September 11, 2019, the Securities and Exchange Commission declared the Prospectus effective.[8] The Prospectus detailed the steps the Company took to carry out the Up-C reorganization in preparation for the IPO. The Prospectus disclosed that Financial's pre-IPO investors could convert their LLC Units into shares of SDC stock:

> Subject to the terms and conditions of the SDC Financial LLC Agreement, the Continuing LLC Members will have the right to exchange their LLC Units (with automatic cancellation of an equal number of shares of Class B common stock) for shares of our Class A common stock on a one-for-one basis, subject to customary adjustments for stock splits, stock dividends and reclassifications, or for cash (based on the market price of shares of Class A common stock), with the form of consideration determined by the disinterested members of our board of directors.[9]

The Prospectus also disclosed that if the IPO successfully raised sufficient funds, the Company intended to use the IPO proceeds to purchase LLC Units and Class A common stock from existing holders, including Board members and their affiliates, at the IPO price less the underwriting discount, and to purchase and cancel LLC Units from pre-IPO investors (the "Insider Transactions").[10] Importantly, the

---

[8] *See* Defs.' Ex. 2.

[9] Prospectus at 17–18.

[10] *See, e.g.*, *id.* at 13, 16–17, 60–65.

5

Prospectus led with this critical information, displaying the following text

prominently on its cover page:

> We intend to use approximately $616.3 million of the net proceeds from
> this offering (or approximately $808.2 million if the underwriters'
> option to purchase additional shares of Class A common stock is
> exercised in full) to purchase limited liability company units of SDC
> Financial LLC, our subsidiary, and shares of our Class A common stock
> from existing holders thereof, as described herein.[11]

The Prospectus further disclosed and described at length how the IPO proceeds

would finance the Insider Transactions; the exact number of LLC Units and Class A

shares the Company would purchase from the pre-IPO investors upon the IPO's

closing; and the price at which the Company would purchase those LLC Units and

Class A shares.[12]

---

[11] *Id.*, Cover Page.

[12] *See, e.g.*, *id.* at 13, 16–17, 60–65, 152–53, 151–57.

*We intend to use substantially all of the net proceeds* we receive from this offering (including from any exercise of the underwriters' option to purchase additional shares of Class A common stock) to purchase a number of newly issued LLC Units from SDC Financial, as described under "*Organizational Structure—Offering-Related Transactions*." *We intend to cause SDC Financial to use a portion of such proceeds to purchase and cancel LLC Units from Pre-IPO Investors at a price per LLC Unit equal to the public offering price per share of Class A common stock in this offering, less the underwriting discount*. *In addition, we intend to use a portion of the net proceeds to purchase shares of Class A common stock from [insiders] at a price per share equal to the public offering price per share of Class A common stock in this offering, less the underwriting discount*. See "*Use of Proceeds*" and "*Certain Relationships and Related Party Transactions—Purchase of LLC Unit*s."

Subject to the terms and conditions of the SDC Financial LLC Agreement, holders (other than SDC Inc.) of LLC Units *following the consummation of the Reorganization Transactions and the consummation of this offering and the use of proceeds therefrom* ("Continuing LLC Members") will have the right to exchange their LLC Units (with automatic cancellation of an equal number of shares of Class B common stock) for shares of our Class A common stock on a one-for-one basis, subject to customary adjustments for stock splits, stock dividends and reclassifications, or for cash (based on the market price of shares of Class A common stock), with the form of consideration determined by the disinterested members of our board of directors. As Continuing LLC Members exchange their LLC Units, those LLC Units thereafter will be owned by SDC Inc. and SDC Inc.'s interest in SDC Financial will be correspondingly increased. The corresponding shares of Class B common stock will be cancelled.[13]

The Prospectus disclosed that SDC "intend[ed]" to use (1) approximately $585.5 million "to purchase and cancel LLC Units from Pre-IPO Investors and shares of Class A common stock from [insiders]" at a price "***equal to the public offering price***

---

[13] *Id.* at 13 (emphasis added).

7

*per share of Class A common stock in this offering, less the underwriting discount*," and (2) approximately $111 million "to purchase and cancel LLC Units from the non-Series A Pre-IPO Investors pursuant to the terms of our 2018 Private Placement."[14]  These terms were determined prior to the IPO.

Having described SDC's plan for the IPO proceeds, the Prospectus disclosed that SDC "will have broad discretion in the use of the net proceeds from this offering and may not use them effectively," and that while SDC "management currently intends to use the net proceeds from this offering in the manner described in 'Use of Proceeds' and will have broad discretion in the application of a significant part of the net proceeds from this offering," "failure by [SDC] management to apply these funds effectively could result in financial losses that could harm our business [or] cause the market price for or Class A common stock to decline."[15]  The Prospectus also included a customary "Cautionary Statement Regarding Forward-Looking Statements:"[16]

---

[14] *Id.* at 16–17, 65 (emphasis added).

[15] *Id.* at 55.

[16] *Id.* at 58–59.

This prospectus contains forward-looking statements. Any statements about our expectations, beliefs, plans, predictions, forecasts, objectives, assumptions, or future events or performance are not historical facts and may be forward-looking. These statements are often, but not always, made through the use of words or phrases such as "anticipates," "believes," "can," "could," "may," "predicts," "potential," "should," "will," "estimate," "plans," "projects," "continuing," "ongoing," "expects," "intends," and similar words or phrases. Although we believe that the expectations reflected in these forward-looking statements are reasonable, these statements are not guarantees of future performance and involve risks and uncertainties which are subject to change based on various important factors, some of which are beyond our control.[17]

The cautionary statement reiterated the Company's intention to use the IPO proceeds to consummate the Insider Transactions at the IPO price if the IPO raised sufficient funds.[18]

---

[17] *Id.* at 58; *see also id.* at 59 ("If one or more of the factors affecting our forward-looking information and statements proves incorrect, its actual results, performance or achievements could differ materially from those expressed in, or implied by, forward-looking information and statements. Therefore, we caution not to place undue reliance on any forward-looking information or statements. The effect of these factors is difficult to predict. Factors other than these also could adversely affect our results, and the reader should not consider these factors to be a complete set of all potential risks or uncertainties. New factors emerge from time to time, and management cannot assess the impact of any such factor on our business or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. Any forward-looking statements only speak as of the date of this document, and we undertake no obligation to update any forward-looking information or statements, whether written or oral, to reflect any change, except as required by law. All forward-looking statements attributable to us are expressly qualified by these cautionary statements.").

[18] *See id.* at 59 ("If we issue and sell a number of shares of Class A common stock in excess of the number of shares set forth on the cover page of this prospectus, we expect to use the additional net proceeds to purchase and cancel additional LLC Units and shares of Class A common stock from Pre-IPO Investors at a price per LLC Unit or share of Class A common stock equal to the public offering price per share of Class A common stock in this offering,

9

**B.    The IPO Closes; SDC's Stock Price Falls; And The Company Consummates The Insider Transactions As Planned And Disclosed.**

On September 12, SDC offered 58,537,000 shares of SDC Class A common stock to the public at $23.00 per share, or net proceeds of $21.85 per share after underwriting discounts and commissions, on the NASDAQ stock exchange. The Prospectus disclosed that the offering price resulted from negotiations between the Company and the IPO's independent underwriters, following a price discovery process led by the underwriters, including roadshow presentations with prospective investors.[19]

On opening day, SDC's stock began trading at $20.59 and closed at $16.67 per share. Plaintiffs purchased their shares that day. The next day, September 13, SDC opened trading at $16.81 and closed at $18.68 per share. On September 16, the IPO closed, and the underwriters delivered the shares against payment. The Company raised approximately $1.286 billion in net IPO proceeds. That day, SDC's stock price declined and traded between $17.81 and $19.00 per share, and closed at $18.90 per share.

---

less the underwriting discount. As a result, the total numbers of outstanding shares of Class A common stock, LLC Units, and shares of Class B common stock, as well as the relative percentages of equity ownership and voting power of the holders of Class A common stock and Class B common stock, will be adjusted accordingly from the information.").

[19] *See id.* at 173.

Also on September 16, having raised sufficient funds in the IPO, the Company "immediately used the majority of the [IPO]'s proceeds" to consummate the Insider Transactions as planned and disclosed in the Prospectus.[20] SDC could not and did not carry out the Insider Transactions before that day "because SDC did not possess those funds."[21] The Company used over $696 million of the IPO's net proceeds to purchase LLC Units and shares of Class A common stock for $21.85 each. The three Katzman defendants, Fenkell, Rammelt, and Schnall received approximately $628.6 million from the Insider Transactions, either directly or through their affiliates.

On November 12, 2019, after the IPO and the Insider Transactions closed, SDC disclosed in public filings that "[t]here was no material change in the use of proceeds as described in the Prospectus."[22] SDC stated that its management "exercised its 'broad discretion' as described in the Prospectus and acted on its stated 'intent,' using over $696 million of the [IPO]'s proceeds to acquire Units and Common Stock from corporate insiders for $21.85."[23] Thus, SDC did exactly what it disclosed it would do in the Prospectus.

---

[20] Compl. ¶ 5.

[21] *Id*. ¶ 50.

[22] *Id*. ¶ 51.

[23] *Id.* (alteration omitted).

11

## C.    Plaintiffs File This Derivative Action.

The Insider Transactions resulted in multiple actions in this Court, filed in late 2019 and early 2020.[24] Those actions were consolidated under the present caption,[25] and on April 8, 2020, Plaintiffs filed their Consolidated Verified Stockholder Derivative Complaint (the "Complaint"). Count I asserts a derivative claim for breach of fiduciary duty against the Defendant Board members. Counts II and III assert related derivative claims for aiding and abetting and unjust enrichment, which are premised on the same alleged wrongdoing that supports Count I.

Plaintiffs allege the Board members breached their fiduciary duties by "deciding to pay an excessively high price for the Units and Common Stock acquired" in the Insider Transactions, and "by causing the Company to purchase Units and Common Stock from corporate insiders at a price of $21.85, a grossly inflated price, representing amounts well in excess of the market price and intrinsic value of the Units and Common Stock acquired."[26] Plaintiffs allege the Board

---

[24] *See* D.I. 1, Doris Shenwick Trust's Verified Derivative Complaint for Breach of Fiduciary Duties; *Harts v. Katzman et al.*, C.A. No. 2019-1027-MTZ, Harts's Verified Derivative Complaint for Breach of Fiduciary Duties; *Sammons v. Katzman et al.*, C.A. No. 2020-0169-MTZ, Sammons's Verified Derivative Complaint for Breach of Fiduciary Duties.

[25] D.I. 12. After consolidation, the plaintiffs in each of the three derivative suits—the Doris Shenwick Trust, Kerry Harts, and Jonathan Sammons—proceeded as co-lead plaintiffs in this matter. *See id.* On May 10, 2021, after the parties briefed the Motion and the Court heard argument, Sammons was voluntarily dismissed from the action. *See* D.I. 33.

[26] Compl. ¶ 9.

overpaid in the Insider Transactions, which were fed by an inflated IPO price that was supported by concealing regulatory and financial challenges facing the Company. Plaintiffs claim those regulatory challenges became publicly known in the weeks after the IPO closed, causing the stock price to drop even further. According to Plaintiffs, "[t]he Units and the Common Stock were *never* worth the $21.85 per share that the Company paid";[27] "[t]he Board was aware that the Company was overpaying for the Units and Common Stock but failed to take any steps to protect the Company";[28] and "[n]o reasonable fiduciary fully informed of the relevant facts which the insiders selling securities to the Company knew would have agreed to such a windfall."[29]

On August 14, Defendants filed the Motion pursuant to Court of Chancery Rules 23.1 and 12(b)(6).[30] The parties fully briefed the Motion as of November 6.[31] I held argument on February 17 and took the Motion under advisement.[32]

---

[27] *Id.* ¶ 53 (emphasis in original).

[28] *Id.* ¶ 55.

[29] *Id.* ¶ 7.

[30] *See* D.I. 18.

[31] *See* D.I. 18; D.I. 19; D.I. 21.

[32] *See* D.I. 27; D.I. 29.

## II.    ANALYSIS

On the Motion, Defendants contend Plaintiffs lack standing to pursue their derivative claims.  Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[33]  It is required to "ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[34]  Standing "allows Delaware courts, as a matter of self-restraint, to avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers."[35]

"Standing is properly a threshold question that the Court may not avoid,"[36] and "a legal question that is well suited to resolution on a motion to dismiss."[37]  "In deciding whether a party has standing to bring a claim, the court shall consider who

---

[33] *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 128 (Del. 2021) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[34] *Id.* at 128–29 (quoting *Dover Hist. Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)); *accord In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859, at *8 (Del. Ch. Oct. 30, 2020).

[35] *Morris*, 246 A.3d at 129 (internal quotation marks omitted) (quoting *Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 264 (Del. 1995)).

[36] *Id.* (alteration omitted) (quoting *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013)).

[37] *In re AbbVie Inc. S'holder Deriv. Litig.*, 2015 WL 4464505, at *3 (Del. Ch. July 21, 2015); *accord TerraForm*, 2020 WL 6375859, at *8 ("The issue of whether the Plaintiffs have standing is an issue precedent to consideration of a complaint, and is an issue of law.").

14

is entitled to bring a lawsuit rather than the merits of the particular controversy."[38]

But "[w]here, as here, the question of standing is so closely related to the merits," and asks "not whether this Court has jurisdiction to grant requested relief to *any* plaintiff, but rather whether the Court can grant the requested relief to *these* plaintiffs, the appropriate framework is under Rule 12(b)(6)."[39]

On a motion to dismiss under Rule 12(b)(6), this Court accepts as true all well-pled factual allegations, including even vague allegations if they give the opposing party notice of the claim, and draws all reasonable inferences in favor of the non-moving party.[40] The Court will deny a motion to dismiss unless, with the foregoing principles in mind, there is no reasonably conceivable set of circumstances under which the plaintiff could recover.[41] Thus, I consider Plaintiffs' Complaint through this lens, keeping in mind that "[t]he party invoking the jurisdiction of [this Court] bears the burden of establishing the elements of standing."[42]

---

[38] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1168 (Del. Ch. 2002) (alterations and internal quotation marks omitted) (quoting *U-H Acq. Co. v. Barbo*, 1994 WL 34688, at *3 (Del. Ch. Jan. 31, 1994)).

[39] *AbbVie*, 2015 WL 4464505, at *3 (emphasis in original) (internal quotation marks omitted) (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285 (Del. 2007)).

[40] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[41] *Id.*

[42] *Dover Hist. Soc'y*, 838 A.2d at 1109.

**A.** **Delaware Law Mandates That A Derivative Plaintiff Satisfy The Contemporaneous Ownership Requirement Set Forth In 8 *Del. C.* § 327.**

"The standing inquiry has assumed special significance in the area of corporate law."[43] This is especially true regarding a derivative claim, "a cause of action belonging to a corporation that another party, typically a stockholder, seeks to litigate on the entity's behalf."[44] In those cases, the stockholder, as "the equity owner[,] acts in a representative capacity on behalf of an entity. In that representative capacity, the plaintiff steps into the shoes of the entity and asserts the injury on its behalf."[45] Because of the division between ownership and control of the claim, a derivative plaintiff's ability to pursue that claim on the company's behalf is governed by a specialized standing inquiry: "[t]he right to sue derivatively is a property right associated with share ownership."[46] To sue for breach of fiduciary duty, a plaintiff must be owed those duties, and therefore must be a stockholder.[47]

---

[43] *Morris*, 246 A.3d at 129 (quoting *Ala. By-Prods.*, 657 A.2d at 264).

[44] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *8 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020); *see also Ala. By-Prods.*, 657 A.2d at 264 ("In simplest terms, the derivative action is a litigation device that enables shareholders to sue on behalf of the corporation where those in control of the company refuse or fail to assert a claim belonging to it The derivative suit is a uniquely equitable remedy." (citations omitted)).

[45] *Morris*, 246 A.3d at 129.

[46] *Urdan*, 2019 WL 3891720, at *8.

[47] *See In re MAXXAM, Inc./Federated Dev. S'holders Litig.*, 698 A.2d 949, 956–57 (Del. Ch. 1996) ("A derivative claim belongs to the corporation, not to the shareholder plaintiff who brings the action. The shareholder plaintiff's interest is limited to compelling the corporation (by 'standing in its shoes') to assert the corporation's right to seek redress for

"That is why plaintiffs who seek to assert breach of fiduciary duty claims of this kind have been persons to whom such fiduciary duties were owed, *i.e.*, stockholders of the [] corporation."[48]

Against this background, Delaware has adopted "two similarly sounding doctrines that both affect the ability of stockholders to bring derivative claims—the contemporaneous ownership requirement and the continuous ownership requirement[.]" [49] "The contemporaneous ownership requirement arose as a limitation on the ability of stockholders to bring derivative actions on behalf of corporations." [50] In 1945, the Delaware General Assembly codified the contemporaneous ownership requirement in Section 327 of the DGCL:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.[51]

---

the alleged wrongdoing. The stockholder plaintiff's claim for redress in a derivative action is not personal. It is derivative, and exists solely because of the plaintiff's interest as a shareholder." (citations omitted)).

[48] *Omnicare*, 809 A.2d at 1171–72 (quoting *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *13 (Del. Ch. Aug. 20, 1996)).

[49] *Urdan*, 2019 WL 3891720, at *8.

[50] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020).

[51] 8 *Del. C.* § 327; *see also Bamford*, 2020 WL 967942, at *24 n.18 (discussing Delaware's adoption of the contemporaneous ownership requirement and recognizing that it has been criticized); *Urdan*, 2019 WL 3891720, at *10 (discussing the history, origin, and adoption of the contemporaneous ownership requirement in Delaware).

"Section 327 is clear that stock ownership at the time of challenged conduct is a prerequisite to maintaining a derivative action . . . ."[52] As interpreted, the requirement was meant "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock."[53] "This policy has been vigorously enforced through recent times."[54] Rule 23.1 procedurally implements Section 327, and requires a derivative plaintiff to allege that she owned stock at the time of the complained-of transaction or that her shares devolved upon her by operation of law.[55] If the derivative plaintiff alleges facts establishing she was a stockholder at the time of the challenged transaction, then she has standing to pursue a derivative claim on the entity's behalf.

### B. Plaintiffs Have Failed To Allege Facts Sufficient To Demonstrate Contemporaneous Ownership Under Section 327.

For Plaintiffs to have standing to assert their derivative claims, they must have been SDC stockholders at the time of the challenged conduct. Defendants argue that Plaintiffs cannot challenge the Insider Transactions, including the price at which they were carried out, because their terms were determined before the IPO through

---

[52] *Desimone v. Barrows*, 924 A.2d 908, 927 (Del. Ch. 2007).

[53] *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948); *accord Desimone*, 924 A.2d at 926–27; *Omnicare*, 809 A.2d at 1169–70; *MAXXAM*, 698 A.2d at 956–57.

[54] *Omnicare*, 809 A.2d at 1169.

[55] *See AbbVie*, 2015 WL 4464505, at *3.

which Plaintiffs bought their stock and were implemented automatically upon the IPO's closing, as fully disclosed in the Prospectus.[56] In response, Plaintiffs contend "[t]he Company's purchase of the LLC Units and Common Stock did not take place until September 16, 2019," and "Plaintiffs became stockholders four days before the crucial event giving rise to Plaintiffs' claims."[57] To support their respective positions, the parties spar over the applicability of two cases: *7547 Partners v. Beck*[58] and *Leung v. Schuler*,[59] which considered the proper moment at which the Court should consider whether a plaintiff is a stockholder with derivative standing.

### 1. *Beck* Provides The General Rule; *Leung* Provides The Exception.

For standing purposes, the "time of the challenged conduct" is measured by the precise action the plaintiff challenges in the complaint. Where the plaintiff complains of the transaction's terms, rather than the technicalities of its actual

---

[56] *See* D.I. 18 at 23–29.

[57] D.I. 19 at 9.

[58] 682 A.2d 160 (Del. 1996) (applying Section 327 strictly to bar a derivative suit and holding that standing should be measured from the moment a transaction's terms were determined, rather than the moment the transaction was complete).

[59] 2000 WL 264328 (Del. Ch. Feb. 29, 2000) (measuring standing from the moment the challenged transaction closed in view of the specific facts presented, and holding that a stockholder had standing to pursue a derivative suit for purposes of Section 327).

consummation, the "time of the challenged transaction" is the time when the transaction's terms were established.[60]

In *Beck*, the Delaware Supreme Court held "the timing of the allegedly wrongful transaction must be determined by identifying the wrongful acts which [the plaintiffs] want remedied and which are susceptible of being remedied in a legal tribunal."[61] The Court considered the derivative claims of a plaintiff that bought stock in an initial public offering at a price much higher than that paid by corporate executives in an accompanying private placement.[62] From the complaint, the Court determined the plaintiff challenged and sought a remedy for the private placement's terms, rather than the technicality and execution of its consummation; and so the

---

[60] *Beck*, 682 A.2d at 162–63; *see also In re Beatrice Cos. Inc., Litig.*, 1987 WL 36708, at *3 (Del. 1987) (TABLE) (holding that, to properly challenge a proposed merger, a plaintiff must have been a stockholder at the time its terms are agreed upon, because it is those terms which are challenged, not the technicalities of the merger's consummation); *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del. 1950) (holding that the wrongful act occurred when the defendants diverted three corporate opportunities to purchase stock, not when the merger was subsequently consummated); *Omnicare*, 809 A.2d at 1169 n.11 ("A stockholder-plaintiff is barred from bringing claims when she purchases stock after the board of directors has approved a transaction and the transaction has been publicly disclosed."); *Dieter v. Prime Comput., Inc.*, 681 A.2d 1068, 1072 (Del. Ch. 1996) ("It is not the Merger that constitutes the wrongful act of which Plaintiffs complain; it is the fixing of the terms of the transaction." (internal quotation marks omitted)); *Brown v. Automated Mktg. Sys., Inc.*,1982 WL 8782, at *2 (Del. Ch. Mar. 22, 1982) ("[I]t is not the merger itself that constitutes the wrongful act of which plaintiff complains, but rather it is the fixing of the terms of the transaction which will be finalized by the consummation of the merger which provides the foundation for the suit.").

[61] *Beck*, 682 A.2d at 162 (alterations and internal quotation marks omitted) (quoting *Newkirk*, 76 A.2d at 123).

[62] *See id.* at 161.

challenged transaction took place when the terms of the private placement "were established."[63] The Court concluded the plaintiff, who bought stock in the public offering, lacked standing to challenge the private placement's pricing because the plaintiff was not a stockholder when its terms were established.[64] This Court, as well as Delaware's sister courts, have applied *Beck* to conclude that "[a]s a general matter, when the terms of a transaction are established—not when the transaction is carried out—is the proper time for assessing whether a breach of fiduciary duty occurred."[65]

*Beck* itself recognized exceptions to this general rule. When the plaintiff challenges "the technicality of [a transaction's] consummation," rather than the terms of the transaction itself, the Court will measure standing from the time the transaction was completed.[66] For example, in *Maclary v. Pleasant Hills, Inc.*,[67] the

---

[63] *Id.* at 163.

[64] *Id.*

[65] *In re Nine Sys. Corp. S'holders Litig.*, 2013 WL 771897, at *7 (Del. Ch. Feb. 28, 2013) (citing *Beck*, 682 A.2d at 162–63); *see also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 406–07 (7th Cir. 2000); *CarrAmerica Realty Corp. v. Kaidanow*, 331 F.3d 999, 1000–01 (D.C. Cir. 2003); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 463–67 (S.D.N.Y. 2013), *aff'd sub nom. In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*, 797 F.3d 148 (2d Cir. 2015); *Umbach v. Carrington Inv. P'rs*, 2009 WL 413346, at *9 (D. Conn. Feb. 18, 2009); *AIG Ret. Servs., Inc. v. Altus Fin. S.A.*, 2006 WL 8436486, at *3–5 (C.D. Cal. Feb. 8, 2006); *O'Neill v. O'Neil*, 30 N.E.3d 134 (Mass. App. Ct. 2015) (TABLE).

[66] *Beck*, 682 A.2d at 163 (quoting *Beatrice Cos.*, 1987 WL 36708, at *3).

[67] 109 A.2d 830 (Del. Ch. 1954).

plaintiff brought a derivative action seeking, among other things, the cancellation of one hundred shares of stock allegedly issued without consideration. The board passed the resolution authorizing the issuance of those shares before the plaintiff inherited the stock. The issuance itself, which the plaintiffs alleged also constituted wrongdoing, occurred after the plaintiffs inherited their shares (and three years after the resolution). The *Maclary* Court held that, based on the allegedly unlawful and delayed issuance, the challenged transaction should not be deemed complete until the stock certificates were issued:

> [T]here is nothing in the policy behind [Section 327] which would call for a construction favoring its application in situations where inexcusable inaction on the part of corporate personnel might make it less likely that wrongdoing would be discovered. It would seem more likely that a wrongful issuance of stock would be discovered if the issuance thereof and the stockholdings appeared of record. To consider this transaction as having been completed prior to the issuance of the certificates would sanction an application of the statute not required by its language and not fairly required to effectuate its purpose. On the contrary, it would place a premium on corporate conduct which might run counter to desirable standards.[68]

Later, in *Beck*, the Delaware Supreme Court echoed the trial court's conclusion that *Maclary* "was a special case in which a rule was crafted to meet unusual circumstances."[69]

---

[68] *Id.* at 833.

[69] *Beck*, 682 A.2d at 162.

*Leung v. Schuler* presented this Court with the occasion to apply *Maclary*'s narrow exception.[70] There, the plaintiff brought derivative claims based on a stock-for-stock and note-for-note merger, issued at an allegedly below-market price. That merger was accompanied by an insider sale that was not disclosed to stockholders until after their shares and notes had been automatically converted and diluted.

The *Leung* plaintiff was originally a stockholder and noteholder of the target company, which had been experiencing significant financial difficulty and was on the verge of bankruptcy. The target was acquired through a merger. In connection with the merger, the plaintiff was informed that there was a substantial likelihood that the target's stockholders would receive no consideration in the merger, and that its noteholders would likely only receive convertible subordinated notes in exchange for their existing notes. The target stockholders approved the merger. As consideration, the plaintiff received exchange notes that entitled him, at any time within thirty days after closing, to convert his debt into the post-merger company's common stock. If he did not make any election regarding conversion, then half of the principal amount of his exchange notes would automatically be converted into common stock. The plaintiff made no election, so half of the face amount of his exchange notes was automatically converted.

---

[70] 2000 WL 264328 (Del. Ch. Feb. 29, 2000).

23

Unbeknownst to the plaintiff at the time he voted to approve the merger and allowed his exchange notes to convert, the acquirer's board had approved insider stock issuances that would ultimately constitute 26.5% of the acquirer's equity. The initial issuance was approved one month before the merger was consummated, and at a second meeting held on the day the target stockholders approved the merger, the acquirer's board increased the number of shares to be issued to insiders. The insider issuance closed three months after the merger. But the plaintiff did not learn of it until it was disclosed for the first time nearly seven months after its initial authorization, in a prospectus issued in connection with the acquirer's initial public offering. In his complaint, the plaintiff alleged that had he known of the dilutive issuances, he would have elected not to convert any of his exchange notes into acquirer shares. As the Court observed, the thrust of the plaintiff's claims was that the acquirer's board breached their duties by completing the insider issuance, which it failed to disclose to the then-target stockholders and noteholders.[71]

The defendants argued that the derivative claims should be dismissed for lack of standing because the insider issuance concluded when the acquirer's directors authorized it, and the plaintiff did not become a stockholder until two months after.[72] The plaintiff pressed that the complained-of insider issuance was not completed until

---

[71] *Id.* at *3, *7–8.

[72] *Id.* at *7.

almost two months after he became a stockholder.[73] The Court agreed with the plaintiff, concluding that *Maclary* applied. [74] The Court determined that the challenged stock issuance was independently actionable and that standing should be assessed when it was actually "completed," not when its terms were set.[75] While the acquirer's directors may have authorized the insider issuance before the merger closed, no claim could or did arise (because the transaction was not complete) until the shares were actually issued, months after closing.[76] By then, the plaintiff was a stockholder and therefore had standing to challenge that issuance.[77]

In reaching this conclusion, the *Leung* Court distinguished *Beck*:

> The claim advanced in *Beck* is different from the claims asserted here and in *Maclary*. In *Beck*, the alleged wrong was the board's decision to fix a below-market price for the stock being offered in the IPO. ***Once that price was fixed, the transaction was completed, and there was nothing further for the board to do***. But, here (as in *Maclary*), the alleged wrong is the *issuance* of the stock to the Insiders in April and May 1996, rather than its authorization by the board two months before.[78]

---

[73] *Id.*

[74] *Id.* at *8.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.* (emphasis added).

Most recently, this Court echoed *Maclary*'s exception in *In re Nine Systems Corp. Shareholders Litigation*.[79] The defendants argued the plaintiffs lacked standing to assert derivative dilution claims because "the decisions that resulted in the dilution were made before they were owed fiduciary duties."[80] The Court disagreed with the defendants. Contrasting *Beck*, the Court pointed out that "this is not a matter where events occurring after that date were simply a matter of implementing a transaction with previously fixed terms."[81] The board formally reviewed and approved the dilutive transaction's terms before the plaintiffs became stockholders, but modified those terms after the plaintiffs became stockholders.[82] That the board did so informally did not matter.[83] Although the board established the "path" to the dilutive recapitalization before the plaintiffs acquired stock, "arguably significant terms evidently were not established" until thereafter.[84] The Court concluded the plaintiffs had standing to challenge the issuance.[85]

In view of *Beck*'s cabining of *Maclary* to its facts, I consider *Leung* through the same lens: as an exception to *Beck*'s general rule, to be applied sparingly when

---

[79] 2013 WL 771897 (Del. Ch. Feb. 28, 2013).

[80] *Id.* at *7.

[81] *Id.*

[82] *Id.* at *3–5, *7

[83] *Id.* at *7.

[84] *Id.*

[85] *Id.*

a plaintiff specifically challenges the mechanics of delayed implementation of a transaction that the board both failed to disclose before the plaintiff became a stockholder, and modified after the plaintiff became a stockholder. The Court measures standing from the board's decision to approve a transaction where the board's post-decision actions "were simply a matter of implementing a transaction with previously fixed terms."[86] Where the plaintiff acquired stock after "th[e] price was fixed, the transaction was completed, and there was nothing further for the board to do,"[87] the plaintiff lacks standing to bring a derivative claim.

### 2. This Case Falls Squarely Under *Beck* And Does Not Trigger *Maclary* and *Leung*.

Plaintiffs press that they have standing to challenge the Insider Transactions under *Leung* and that *Beck* is inapposite.[88] Plaintiffs argue that, as in *Leung*, "the wrongful act forming the basis of the derivative claim took place when the [Insider Transactions] w[ere] completed, after Plaintiffs became stockholders," as "no claim could have arisen until the Company's intent was manifested despite changed circumstances," namely the continuously declining stock price and the allegedly undisclosed regulatory challenges that were publicly aired only after the IPO

---

[86] *Id.*

[87] *Leung*, 2000 WL 264328, at *8; *see also Beck*, 682 A.2d at 162–63.

[88] *See* D.I. 19 at 12–13.

closed.[89]  In support of their preferred timing, and despite carrying the burden to establish standing, Plaintiffs posit that "Defendants have not pointed to any pre-existing agreement requiring the Company to purchase the LLC Units and Common Stock for $21.85, or requiring the [Board] to proceed with the sale of the Units or Common Stock at that price on September 16, 2019."[90]  Rather, the Prospectus disclosed only the Company's "intent" to consummate the Insider Transactions in connection with the IPO, which was "subject to change based on various important factors."[91]  Plaintiffs further argue that "the Purchase could not possibly have been effectuated until after the IPO had closed," because "SDC had not received the IPO proceeds until the IPO closed, and thus did not possess the funds necessary to effectuate the purchase of the LLC Units and Common Stock prior to that time."[92]

The facts of this case bear no resemblance to *Leung*, *Maclary*, or *Nine Systems*, "special case[s] in which a rule was crafted to meet unusual circumstances."[93]  Plaintiffs' primary issue is that the Board (1) fixed the Insider Transactions' price together with the IPO, knowing both prices were inflated; and (2) consummated the Insider Transactions at those prices, even as the market

---

[89] *Id.* at 13.

[90] *Id.* at 9–10.

[91] *Id.* at 11–12 (citing and quoting Prospectus at 13, 16, 58, 62–65, 152–53).

[92] *Id.* at 9.

[93] *Beck*, 682 A.2d at 162.

reflected the price's unfairness and responded to overdue disclosures of regulatory issues. The Complaint alleges the Board's decision to pursue the Insider Transactions was set before the IPO, as the "[IPO]'s premium price allowed Defendants to effectuate the use of the [IPO]'s proceeds" to complete the anticipated Insider Transactions.[94]

As in *Beck*, Plaintiffs allege that SDC's Board knew, during the IPO pricing negotiations, that the stock was "*never* worth the $21.85 per share that the Company paid" in the Insider Transactions when it set that price before the IPO.[95] The Board decided before launching the IPO to use the outsized IPO proceeds to repurchase insider equity, knowing the price was excessive. Unlike *Maclary*, *Leung*, and *Nine Systems*, Plaintiffs do not allege the Board made a conscious decision, modified any terms, or delayed in carrying out their disclosed plans to complete the Insider Transactions after the IPO closed and the market price dropped. Plaintiffs do not allege, for example, that the Board learned the price was too high only upon the market's unfavorable response to the IPO.[96] Rather, the Complaint alleges the Board implemented its pre-IPO plan to repurchase pre-IPO investors' equity at the inflated IPO price, which the Prospectus fully disclosed would have a dilutive and negative

---

[94] Compl. ¶ 54.

[95] *Id.* ¶ 53 (emphasis in original).

[96] *See id.* ¶¶ 5, 53, 55.

impact on the public stockholders.[97] Plaintiffs are "challenging the terms of the [Insider Transactions] rather than the technicality of [their] consummation."[98]

Plaintiffs attempt to hang their claim on the mechanics of the post-IPO consummation by alleging the Board "caus[ed]" the Company to pursue the Insider Transactions at the inflated IPO price after the IPO closed and the stock price continued to drop.[99] Here, the verb "caused" does no work. The Complaint does not distinguish "causing" the Insider Transactions,[100] as a discretionary intentional decision, from "caus[ing]" other pre-close steps Plaintiffs describe as "mandatory," like executing the LLC Agreement.[101] The Complaint's allegations do not give rise

---

[97] *See Beck*, 682 A.2d at 162–63; *Nine Sys.*, 2013 WL 771897, at *7; *Montgomery*, 231 F.3d at 406–07; *CarrAmerica Realty*, 331 F.3d at 1000–01; *Facebook*, 922 F. Supp. 2d at 463–67; *Umbach*, 2009 WL 413346, at *9; *AIG Ret. Servs.*, 2006 WL 8436486, at *3–5; *O'Neill*, 30 N.E.3d 134.

[98] *Beck*, 682 A.2d at 163 (internal quotation marks omitted) (quoting *Beatrice Cos.*, 1987 WL 36708, at *3).

[99] Compl. ¶ 9 ("Members of the Board breached their fiduciary duties by withholding material adverse information from the stockholders and by causing the Company to purchase Units and Common Stock from corporate insiders at a price of $21.85, a grossly inflated price, representing amounts well in excess of the market price and intrinsic value of the Units and Common Stock acquired."); *see* D.I. 19 at 8 ("Despite the true value of Common Stock, and thus LLC Units, being closer to $8.74, Defendants caused the Company to purchase the LLC Units and Common Stock in the Insider Transaction for $21.85, diverting significant amounts of the Company's funds to insiders in exchange for patently insufficient consideration.").

[100] Compl. ¶ 9.

[101] *Id.* ¶ 36 ("Also in connection with the IPO, SDC *caused* SDC Financial to amend and restate its operating agreement . . . ." (emphasis added)); *id.* ¶ 42 (describing the execution of the LLC Agreement as "mandatory").

to the reasonable inference that the Board "caused" the Insider Transactions after the IPO closed by doing anything other than implementing its set and disclosed plan.

Plaintiffs point out that the Prospectus describes the Insider Transactions in terms of what the Board "intends" to do.[102] Plaintiffs rely on the Prospectus's explicit recognition that the use of "intends" or similar phrases in its disclosures should indicate a forward-looking statement that is subject to change. But the Prospectus's necessary use of "intends" to describe future transactions that are dependent on raising capital does not change the fact that the pricing of those transactions—which is Plaintiffs' principal complaint—was set. The Insider Transactions were necessarily structured and disclosed in forward-looking terms, as the Company could not have completed them if the IPO flopped, and could not complete them until the Company received its proceeds.[103]

As evidenced by the disclosures, the Board "must have approved or acquiesced in the pricing" before Plaintiffs purchased stock in the IPO.[104] That price

---

[102] *See* D.I. 19 at 10–12.

[103] In that sense, Plaintiffs correctly observe that "the Purchase could not possibly have been effectuated until after the IPO had closed," because "SDC had not received the IPO proceeds until the IPO closed, and thus did not possess the funds necessary to effectuate the purchase of the LLC Units and Common Stock prior to that time." *Id.* at 9.

[104] *7547 P'rs v. Beck* (*Beck I*), 1995 WL 106490, at *2–3 (Del. Ch. Feb. 24, 1995), *aff'd*, 682 A.2d 160 (Del. 1996); *see also Montgomery*, 231 F.3d at 406–07 ("Here, the class complains only about one of the terms of the restructuring plan—the price at which the board of directors sold control of Aetna Plywood—a term that was announced (and therefore established) one month prior to final approval of the parties' settlement agreement. Thus, the challenged transaction took place before the class came into actual

31

was baked into the IPO, and Plaintiffs were aware of it before buying SDC stock. Thus, Plaintiffs allege that the events surrounding the IPO and Insider Transactions unfolded exactly as disclosed in the Prospectus and thereafter: the IPO raised sufficient proceeds, and the Company "immediately" used those proceeds to effectuate the Insider Transactions at the IPO price on the day the IPO closed.[105]

To challenge the Insider Transactions, Plaintiffs must establish that they were SDC stockholders when the Board established the Insider Transactions' terms— before the IPO. Plaintiffs cannot, as they purchased their stock in the IPO. And they have cited no authority in support of a theory of how the wrong alleged in the Complaint could have occurred when they were stockholders.[106] "Such a theory would have the curious result of permitting a party to complain in the name of the corporation about the transaction in which that party purchased stock from the corporation."[107] In view of the Prospectus's thorough disclosures about the Company's plans to complete the Insider Transactions at the IPO price, "it would seem to follow that plaintiff would be barred from suing by reason of its knowledge

---

possession of the Aetna Plywood stock promised to it." (applying *Beck*, 682 A.2d at 162–63)).

[105] Compl. ¶ 5; *see also id.* ¶¶ 50–52.

[106] *See Beck I*, 1995 WL 106490, at *2 (citing *Folk on the Delaware General Corporation Law* § 327.3.1 (1992) ("Generally, the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt.")).

[107] *Id.*

of the alleged wrong when it purchased the stock."[108] This does not mean Plaintiffs are without recourse; it simply means that Plaintiffs do not have the authority to pursue these derivative claims on SDC's behalf.[109]

## III. CONCLUSION

The Motion is **GRANTED** and the Complaint is **DISMISSED**. Because I grant the Motion for lack of standing, it is not necessary to reach Defendants' other arguments in support of dismissal.[110]

---

[108] *Id.* at *3.

[109] *See id.* at *2 ("A party who purchases stock in an initial public offering may of course sue individually. A claim of inadequate disclosure is often made when the market price drops below the offering price.").

[110] *E.g.*, *Bonime v. Biaggini*, 1984 WL 19830, at *3 (Del. Ch. Dec. 7, 1984) ("Because I grant the defendants' motion to dismiss on the ground of lack of standing, it is not necessary to reach the defendants' other arguments in support of their motion to dismiss."), *aff'd*, 505 A.2d 451 (Del. 1985); *Beck I*, 1995 WL 106490, at *3 ("[H]aving concluded that the complaint does not adequately allege standing as a stockholder at the time of the transaction of which plaintiff complains, I need not decide defendants' alternative ground for dismissal."). Because Plaintiffs lack standing to pursue a predicate derivative claim for breach of fiduciary duty, they also lack standing to pursue their derivative aiding and abetting claim. Likewise, they lack standing to pursue their derivative unjust enrichment claim, which invokes the same fundamental challenge to the Insider Transactions by alleging the Defendants were "unjustly enriched, at the expense of and to the detriment of SDC, as a result of selling Common Stock and redeeming LLC Units for materially more than those Common Stock and LLC Units were worth." Compl. ¶ 99.